## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER<br>1519 New Hampshire Avenue, N.W.<br>Washington, D.C. 20036<br><br>      Plaintiff,<br><br>      v.<br><br>NATIONAL SECURITY COMMISSION ON ARTIFICIAL INTELLIGENCE; ERIC SCHMIDT, in his official capacity as Chairman of the National Security Commission on Artificial Intelligence; YLLI BAJRAKTARI, in his official capacity as Executive Director of the National Security Commission on Artificial Intelligence<br>Arlington, Va.<br><br>UNITED STATES DEPARTMENT OF DEFENSE<br>1000 Defense Pentagon<br>Washington, D.C. 20301<br><br>      Defendants. | Civ. Action No. 19-2906 |

## COMPLAINT FOR INJUNCTIVE, MANDAMUS, AND DECLARATORY RELIEF

1.      This is an action under the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2;

the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552; the Administrative Procedure Act

("APA"), 5 U.S.C. §§ 551–706; the Mandamus and Venue Act of 1962, 28 U.S.C. §§ 1361,

1391(e); and the Declaratory Judgment Act, 28 U.S.C. § 2201, to compel the National Security

Commission on Artificial Intelligence ("AI Commission"), senior officers of the AI

Commission, and the United States Department of Defense ("DOD") to comply with their

transparency obligations.

2.      Plaintiff Electronic Privacy Information Center ("EPIC") challenges the failure of the AI Commission and its senior officers (a) to make Commission meetings "open to the public," as required by 5 U.S.C. app. 2 § 10(a)(1); (b) to provide "timely notice of each [Commission] meeting in the Federal Register," as required by 5 U.S.C. app. 2 § 10(a)(2); and (c) to make "available for public inspection and copying" the "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents" of the Commission, as required by 5 U.S.C. app. 2 § 10(b).

3.      EPIC also challenges the failure of the AI Commission and the DOD (a) to timely process FOIA Requests submitted by EPIC to the AI Commission and the DOD ("EPIC's FOIA Requests"), as required by 5 U.S.C. § 552(a)(6); (b) to process EPIC's FOIA Requests on an expedited basis, as required by 5 U.S.C. § 552(a)(6)(E); and (c) to disclose non-exempt records in response to EPIC's FOIA Requests, as required by 5 U.S.C. § 552(a)(3)(A).

4.      The mandate of the AI Commission is to "review advances in artificial intelligence, related machine learning developments, and associated technologies."[1]

5.      The recommendations of the AI Commission could have far-reaching implications for the U.S. government, private companies, and the public at large.

6.      Public access to the records and meetings of the AI Commission is vital to ensure government transparency and democratic accountability.

---

[1] John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, § 1051(a)(1), 132 Stat. 1636, 1962 (2018).

## Jurisdiction and Venue

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 552(a)(4)(B), 5 U.S.C. § 702, 5 U.S.C. § 704, and 28 U.S.C. § 1361. This Court has personal jurisdiction over Defendants.

8.      Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B), 5 U.S.C. § 703, and 28 U.S.C. § 1391(e).

## Parties

9.      Plaintiff EPIC is a nonprofit organization, incorporated in Washington, D.C., established in 1994 to focus public attention on emerging privacy and civil liberties issues. Central to EPIC's mission is oversight and analysis of government activities that impact individual privacy. EPIC is a membership organization. The Members of EPIC's Advisory Board include distinguished experts in law, technology, and public policy.

10.     EPIC is one of the leading organizations in the country with respect to the privacy and human rights implications of AI use.

11.     In 2014, EPIC petitioned the Office of Science and Technology Policy to conduct a public comment process on big data and the future of privacy.[2] EPIC stated, "We believe that the public policy considerations arising from big data and privacy are issues of national concerns that 'require the attention at the highest levels of Government.'"[3]

---

[2] EPIC et al., *Petition for OSTP to Conduct Public Comment Process on Big Data and the Future of Privacy* (Feb. 10, 2014), https://epic.org/privacy/Ltr-to-OSTP-re-Big-Data.pdf.
[3] *Id.* at 1 (citing *Remarks by the President on Review of Signals Intelligence*, The White House (Jan. 17, 2014), http://www.whitehouse.gov/the-press-office/2014/01/17/remarks-president-review-signalsintelligence).

12.     In 2015, EPIC led an international campaign for "algorithmic transparency," a practice which reduces bias and helps ensure fairness in automated decisionmaking.[4]

13.     In 2018, EPIC led the drafting of the Universal Guidelines for Artificial Intelligence, a framework for AI governance based on the protection of human rights.[5] The Universal Guidelines have been endorsed by more than 250 experts and 60 organizations in 40 countries.[6]

14.     In 2019, EPIC published the *EPIC AI Policy Sourcebook*, the first compendium of AI policy frameworks and related AI resources.[7]

15.     EPIC regularly shares AI expertise and policy recommendations with Congressional committees,[8] federal agencies,[9] and international organizations.[10]

16.     EPIC is currently seeking the release of a 2014 Department of Justice ("DOJ") report to the White House concerning the use of predictive analytics and risk assessment algorithms in the criminal justice system.[11] The DOJ has warned that assessments based on sociological and

---

[4] EPIC, *Algorithmic Transparency: End Secret Profiling* (2019), https://epic.org/algorithmic-transparency/.
[5] The Public Voice, *Universal Guidelines for Artificial Intelligence* (Oct. 23, 2018), https://thepublicvoice.org/ai-universal-guidelines/.
[6] The Public Voice, *Universal Guidelines for Artificial Intelligence: Endorsement* (2019), https://thepublicvoice.org/AI-universal-guidelines/endorsement/.
[7] EPIC, *EPIC AI Policy Sourcebook 2019* (2019), https://epic.org/bookstore/ai2019/.
[8] *E.g.*, Statement of EPIC to the Senate Comm. on the Judiciary (Nov. 30, 2018), https://epic.org/testimony/congress/EPIC-SJC-AIRoundtable-Nov2018.pdf.
[9] *E.g.*, Comments of EPIC to Office of Mgmt. and Budget (Aug. 9, 2019), https://epic.org/privacy/AI/EPIC-OMB-AI-Comments.pdf (concerning "Identifying Priority Access or Quality Improvements for Federal Data and Models for Artificial Intelligence Research and Development and Testing"); Comments of EPIC to NIST (May 31, 2019), https://epic.org/privacy/ai/NIST-RFI-EPIC%2020190531.pdf (concerning "Artificial Intelligence Standards"); Comments of EPIC to Dep't of Def. (Apr. 22, 2019), https://epic.org/apa/comments/EPIC-Comments-DOD-Insider-Threat-Apr2019.pdf (concerning the "DoD Insider Threat Management and Analysis Center and DoD Component Insider Threat Records System").
[10] Comments of EPIC to Council of Eur. (Aug. 15, 2019), https://epic.org/privacy/intl/EPIC-comments-AI-COE.pdf (concerning "the human rights impacts of algorithmic systems").
[11] *EPIC v. DOJ*, No. 18-5307 (D.C. Cir. docketed Oct. 10, 2018).

personal information rather than prior bad acts are "dangerous" and constitutionally suspect, citing the disparate impacts of risk assessments and the erosion of consistent sentencing.[12]

17.     EPIC maintains one of the most popular privacy websites in the world, epic.org, which provides the public with information about emerging privacy and civil liberties issues. EPIC's website includes extensive information about the privacy risks arising from the use of AI technology. EPIC frequently posts documents obtained under the FOIA and the FACA to educate the public about the privacy implications of government programs and activities.

18.     Defendant National Security Commission on Artificial Intelligence is an advisory committee of the United States government within the meaning of 5 U.S.C. app. 2 § 3(2). The AI Commission is also an agency within the meaning of the FOIA, 5 U.S.C. § 552(f), and the APA, 5 U.S.C. § 701(b)(1).

19.     Defendant Eric Schmidt is the Chairman of the AI Commission. Mr. Schmidt previously served as the executive chairman of Alphabet Inc. and as the chairman and chief executive officer of Google Inc. Mr. Schmidt has made numerous statements and engaged in numerous business practices that call into question his commitment to privacy and human rights.[13]

---

[12] EPIC, *EPIC v. DOJ (Criminal Justice Algorithms)*, https://epic.org/foia/doj/criminal-justice-algorithms/.

[13] *See, e.g.*, Ryan Gallagher, *Google's Censored Search Would Help China 'Be More Open,' Said Ex-CEO Eric Schmidt,* The Intercept (May 14, 2019), https://theintercept.com/2019/05/14/google-search-china-eric-schmidt-comments/; Amanda Holpuch, *Google's Eric Schmidt Says Government Spying Is 'The Nature of Our Society'*, The Guardian (Feb. 13, 2013), https://www.theguardian.com/world/2013/sep/13/eric-schmidt-google-nsa-surveillance; Ms. Smith, *Google CEO Schmidt: No Anonymity Is The Future Of Web,* CSO Online (Aug. 9, 2010), https://www.csoonline.com/article/2231573/google-ceo-schmidt--no-anonymity-is-the-future-of-web.html; Bianca Bosker, *Eric Schmidt On Privacy (VIDEO): Google CEO Says Anonymity Online Is 'Dangerous',* HuffPost (Aug. 8, 2010) ("In a world of asynchronous threats, it is too dangerous for there not to be some way to identify you. We need a [verified] name service for people. Governments will demand it."), https://www.huffpost.com/entry/eric-schmidt-privacy-stan_n_677224; Ryan Tate, *Google CEO: Secrets Are for Filthy People*, Gawker (Dec. 4. 2009), https://gawker.com/5419271/google-ceo-secrets-are-for-filthy-people; *see also* Shannon

20.     Defendant Ylli Bajraktari is the Executive Director of the AI Commission.

21.     Defendant United States Department of Defense is an agency within the meaning of the FOIA, 5 U.S.C. § 552(f).

## Facts

### The Privacy and Human Rights Risks Posed by the Use of Artificial Intelligence

22.     Artificial intelligence presents unique threats to privacy, human rights, and democratic institutions.

23.     The deployment of AI systems tests long-standing privacy safeguards governing the collection and use of personal data. For example, privacy laws mandate data minimization—the requirement that only necessary data be retained.[14] Yet "[i]n the search for new connections and more precise analyses, it is tempting to give [a] system access to as much data as possible."[15]

---

Liao, *China is forcing internet companies to end online anonymit*y, The Verge (Aug. 28, 2017), https://www.theverge.com/2017/8/28/16217602/china-censorship-real-identities-weibo-blogging-all-content; Catherine Shu, *China doubles down on real-name registration laws, forbidding anonymous online posts*, TechCrunch, (Aug. 28, 2017), https://techcrunch.com/2017/08/27/china-doubles-down-on-real-name-registration-laws-forbidding-anonymous-online-posts/. *But see McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995) ("Anonymity is a shield from the tyranny of the majority. . . . It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society. The right to remain anonymous may be abused when it shields fraudulent conduct. But political speech by its nature will sometimes have unpalatable consequences, and, in general, our society accords greater weight to the value of free speech than to the dangers of its misuse."); *Talley v. California*, 362 U.S. 60, 64 (1960) ("Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all.").

[14] *See, e.g.*, 18 U.S.C. § 2710(e) ("A person subject to this section shall destroy personally identifiable information as soon as practicable . . . ."); OECD, Recommendation of the Council on Artificial Intelligence, C/MIN(2019)3/FINAL (May 22, 2019), https://legalinstruments.oecd.org/en/instruments/OECD-LEGAL-0449.

[15] Int'l Working Group on Data Prot. in Telecomm., *Working Paper on Privacy and Artificial Intelligence* 9 (2018), https://epic.org/IWG/WP-AI.pdf.

China, for instance, uses sophisticated AI surveillance technology to profile and control Muslim minority populations.[16] The same drive to amass personal data for AI training purposes also increases cybersecurity exposure to criminal hackers and nation states.

24.     Automated decisionmaking and profiling with AI systems can produce biased and inaccurate decisions, with serious consequences for the persons improperly targeted. Similarly, unrepresentative data sets can produce flawed AI models.[17] For example, commercial facial recognition software that is trained overwhelmingly on the faces of white males has been shown to misidentify women of color at dramatically higher rates.[18]

25.     There is a clear need for human rights protections for AI systems in the national security context, where public oversight is often limited. Yet there are already indications that the U.S. Intelligence Community has failed to invest in vital AI safeguards. In May 2019, the Inspector General of the Intelligence Community highlighted a lack oversight for the use of AI, warning that "[i]nvestment asymmetry between mission performance and intelligence oversight in AI efforts could lead to an accountability deficit. . . . [T]here is little indication that investments in oversight of AI are currently a high priority."[19]

---

[16] Paul Mozur, *Inside China's Dystopian Dreams: AI, Shame and Lots of Cameras*, N.Y. Times (July 8, 2018), https://www.nytimes.com/2018/07/08/business/china-surveillance-technology.html.

[17] Int'l Working Group on Data Prot. in Telecomm., *supra* note 15, at 8.

[18] Steve Lohr, *Facial Recognition Is Accurate, if You're a White Guy*, N.Y. Times (Feb. 9, 2019), https://www.nytimes.com/2018/02/09/technology/facial-recognition-race-artificial-intelligence.html ("A.I. software is only as smart as the data used to train it. If there are many more white men than black women in the system, it will be worse at identifying the black women. One widely used facial-recognition data set was estimated to be more than 75 percent male and more than 80 percent white, according to another research study.").

[19] Press Release, Office of the Inspector Gen. of the Intelligence Cmty., The Inspector General of the Intelligence Community Issues Statement on Artificial Intelligence (May 30, 2019), https://www.dni.gov/files/ICIG/Documents/News/ICIG%20News/2019/May%2030%20-%20AI/Press%20Release%20-%20AI.pdf.

26.     Privacy, security, and discrimination are not the only civil liberties and human rights issues raised by use of AI systems. International AI policy frameworks—including the OECD Principles on Artificial Intelligence, to which the United States is a signatory;[20] the Universal Guidelines for Artificial Intelligence; and guidelines from leading scientific organizations—set out explicit rights and responsibilities concerning the use of AI systems. These include transparency and identification requirements, testing requirements, fairness, data quality, public safety, contestability, reliability, termination, and more.[21]

### Public Participation in Artificial Intelligence Policymaking

27.     The vast majority of AI policymaking around the world is conducted transparently and relies on public participation.

28.     National governments and international organizations routinely seek public input on AI policy. Europe's High-Level Expert Group on Artificial Intelligence—a group of academic, civil society, and industry representatives—held a public consultation on Europe's draft Ethics Guidelines for AI.[22] The Council of Europe invited public comment on a draft recommendation concerning the human rights impacts of algorithmic systems.[23]

29.     The Organisation for Economic Cooperation and Development ("OECD") established the Artificial Intelligence Group of Experts ("AIGO") to represent OECD member organizations, held several meetings, sought comments from civil society, and produced the OECD Principles

---

[20] NTIA, *U.S. Joins with OECD in Adopting Global AI Principles* (May 22, 2019), https://www.ntia.doc.gov/blog/2019/us-joins-oecd-adopting-global-ai-principles.
[21] *See generally* EPIC, *EPIC AI Policy Sourcebook 2019, supra.*
[22] Eur. Comm'n, *Draft Ethics guidelines for trustworthy AI* (Dec. 18, 2018), https://ec.europa.eu/digital-single-market/en/news/draft-ethics-guidelines-trustworthy-ai.
[23] Council of Eur., *Invitation to comment by 19 August 2019* (July 5, 2019), https://www.coe.int/en/web/freedom-expression/-/invitation-to-comment-by-19-august-2019.

on Artificial Intelligence, which were endorsed by 42 nations and the G20.[24] The OECD underscored that it undertook an "inclusive and participatory process for developing the Recommendation."[25]

30.     Governments around the world have conducted transparent consultations on AI policy. Japan conducted a public consultation and published draft AI research and development guidelines to prompt international debate over AI policymaking.[26] The Australian government published a proposed AI ethics framework for public consultation.[27] And Canada and France made a joint public proposal for an international panel on artificial intelligence.[28] All told, Australia, Canada, China, Denmark, the European Commission, Finland, France, Germany, India, Italy, Japan, Kenya, Malaysia, Mexico, New Zealand, the Nordic-Baltic Region, Poland, Russia, Singapore, South Korea, Sweden, Taiwan, Tunisia, the UAE, the United Kingdom, and the U.S. have publicly released AI strategies.[29]

---

[24] OECD, *OECD Principles on AI* (June 2019), https://www.oecd.org/going-digital/ai/principles/.
[25] OECD, *Recommendation of the Council on OECD Legal Instruments Artificial Intelligence* 4 (May 22, 2019), https://legalinstruments.oecd.org/api/print?ids=648&lang=en.
[26] Japan, *Draft AI R&D Guidelines for International Discussions* (July 28, 2017), http://www.soumu.go.jp/main_content/000507517.pdf.
[27] Austl. Gov't, *Artificial Intelligence: Australia's Ethics Framework* (2019), https://consult.industry.gov.au/strategic-policy/artificial-intelligence-ethics-framework/supporting_documents/ArtificialIntelligenceethicsframeworkdiscussionpaper.pdf.
[28] Int'l Panel on Artificial Intelligence, *Mandate for the International Panel on Artificial Intelligence* (2018), https://pm.gc.ca/en/news/backgrounders/2018/12/06/mandate-international-panel-artificial-intelligence.
[29] Tom Dutton, *An Overview of National AI Strategies*, Medium (June 28, 2018), https://medium.com/politics-ai/an-overview-of-national-ai-strategies-2a70ec6edfd.

31.     In the United States, EPIC—joined by leading scientific organizations and nearly 100

experts—filed a petition calling for public participation in federal efforts to develop AI policy.[30]

The coalition stated:

> The reach of AI is so vast, so important, and encompasses so many issues, it is
> imperative that the Administration provide the American public the opportunity to
> comment on proposed policy initiatives impacting the American public. AI has the
> potential to improve our society, but only if proper policies are in place to provide
> the guidance needed to address the potential risks that accompany the potential
> benefits.[31]

32.     The National Science Foundation subsequently announced it would seek public comment

on AI policy.[32]

33.     The National Institute of Standards and Technology published a plan for developing

technical AI standards and sought public comments.[33]

34.     The Office of Management and Budget solicited public comments about the use of

federal data for AI research and development.[34]

35.     The President's Executive Order on "Maintaining American Leadership in Artificial

Intelligence" states:

> Maintaining American leadership in AI requires a concerted effort to promote
> advancements in technology and innovation, while protecting American
> technology, economic and national security, civil liberties, privacy, and American

---

[30] EPIC et al., *Petition to OSTP for Request for Information on Artificial Intelligence Policy* (July 4, 2018), https://epic.org/privacy/ai/OSTP-AI-Petition.pdf.
[31] *Id.* at 3.
[32] EPIC, *Following EPIC Petition, National Science Foundation Seeks Public Comment on AI Policy* (Sep. 26, 2018), https://epic.org/2018/09/following-epic-petition-white-.html.
[33] NIST, *U.S. Leadership in AI: A Plan for Federal Engagement in Developing Technical Standards and Related Tools* (2019), https://www.nist.gov/sites/default/files/documents/2019/08/10/ai_standards_fedengagement_plan_9aug2019.pdf.
[34] Identifying Priority Access or Quality Improvements for Federal Data and Models for Artificial Intelligence Research and Development (R&D), and Testing; Request for Information, 84 Fed. Reg. 32,962 (July 10, 2019).

values and enhancing international and industry collaboration with foreign partners and allies.[35]

36.     There are 11 references to "privacy" in the Executive Order.

37.     The National Science and Technology Council makes 63 references to "privacy" in the supplement to the President's fiscal year 2020 budget.[36]

38.     There is no public reference to any work on "privacy" or any consideration of "privacy" by the AI Commission, despite the Commission holding at least thirteen meetings and receiving more than 100 briefings over the past six months.[37]

<u>The Formation and Structure of the AI Commission</u>

39.     Congress created the National Security Commission on Artificial Intelligence through the John S. McCain National Defense Authorization Act for Fiscal Year 2019 ("NDAA"),[38] signed into law on August 13, 2018. The NDAA directs the AI Commission "to review advances in artificial intelligence, related machine learning developments, and associated technologies."[39]

40.     The AI Commission is "an independent establishment of the Federal Government" that is "in the executive branch."[40]

---

[35] Exec. Order No. 13,859, 84 Fed. Reg. 3,967, 3,967 (Feb. 11, 2019) ("Maintaining American Leadership in Artificial Intelligence").
[36] NSTC, *Supplement to the President's FY2020 Budget* (2019),
 https://www.whitehouse.gov/wp-content/uploads/2019/09/FY2020-NITRD-AI-RD-Budget-September-2019.pdf.
[37] Ex. H at 1–2.
[38] Pub. L. No. 115-232, § 1051, 132 Stat. 1636, 1962–65 (2018).
[39] NDAA § 1051(a)(1).
[40] NDAA § 1051(a).

41.     The AI Commission "shall be composed of 15 members" appointed "for the life of the Commission" by the Secretary of Defense, the Secretary of Commerce, and the chairs and ranking members of six congressional committees.[41]

42.     The "members of the Commission shall be deemed to be Federal employees,"[42] and "[t]he Commission shall terminate on October 1, 2020."[43]

43.     On information and belief, the members of the AI Commission are employed on an "intermittent"[44] basis in "excepted service"[45] positions.

44.     The membership of the AI Commission was finalized by January 2019.[46] The Chairman of the Commission is Defendant Eric Schmidt.[47] The Vice Chairman of the Commission is Robert O. Work, former Deputy Secretary of Defense.[48] The Commission also includes:

- Safra Catz, chief executive officer of Oracle;

- Steve Chien, supervisor of the Artificial Intelligence Group at Caltech's Jet Propulsion Lab;

---

[41] NDAA § 1051(a)(4) (authorizing Commission appointments by the chairs and ranking members of the Senate Committee on Commerce, Science, and Transportation; the House Committee on Energy and Commerce; the Senate Committee on Armed Services; the House Committee on Armed Services; the Senate Select Committee on Intelligence; and the House Permanent Select Committee on Intelligence).
[42] NDAA § 1051(a)(7).
[43] NDAA § 1051(e).
[44] 5 CFR § 340.403.
[45] 5 U.S.C. § 2103.
[46] *See* Sam Shead, *Ex-Google CEO To Lead US Government AI Advisory Group*, Forbes (Jan. 24, 2019), https://www.forbes.com/sites/samshead/2019/01/24/ex-google-ceo-to-lead-ai-us-government-ai-advisory-group/; Tajha Chappellet-Lanier, *Alphabet, Microsoft leaders named to National Security Commission on Artificial Intelligence*, FedScoop (Nov. 14, 2018), https://www.fedscoop.com/alphabet-microsoft-leaders-named-national-security-commission-artificial-intelligence/.
[47] *Commissioners*, National Security Commission on Artificial Intelligence (2019), https://www.nscai.gov/about/commissioners.
[48] *Id.*

- Mignon Clyburn, Open Society Foundation fellow and former FCC commissioner;

- Chris Darby, chief executive officer of In-Q-Tel;

- Ken Ford, chief executive officer of the Florida Institute for Human and Machine Cognition;

- Jose-Marie Griffiths, president of Dakota State University;

- Eric Horvitz, director of Microsoft Research Labs;

- Andy Jassy, chief executive officer of Amazon Web Services;

- Gilman Louie, partner at Alsop Louie Partners;

- William Mark, director of SRI International's Information and Computing Sciences Division;

- Jason Matheny, director of the Center for Security and Emerging Technology and former Assistant Director of National Intelligence;

- Katharina McFarland, consultant at Cypress International and former Assistant Secretary of Defense for Acquisition; and

- Andrew Moore, head of Google Cloud AI.[49]

45.    Under the NDAA, the AI Commission is to "consider the methods and means necessary to advance the development of artificial intelligence, machine learning, and associated technologies by the United States to comprehensively address the national security and defense needs of the United States."[50] Specifically, the Commission is to review:

> (A) The competitiveness of the United States in artificial intelligence, machine learning, and other associated technologies, including matters related to national security, defense, public-private partnerships, and investments.

---

[49] *Id.*
[50] NDAA § 1051(b)(1).

(B) Means and methods for the United States to maintain a technological advantage in artificial intelligence, machine learning, and other associated technologies related to national security and defense.

(C) Developments and trends in international cooperation and competitiveness, including foreign investments in artificial intelligence, related machine learning, and computer science fields that are materially related to national security and defense.

(D) Means by which to foster greater emphasis and investments in basic and advanced research to stimulate private, public, academic and combined initiatives in artificial intelligence, machine learning, and other associated technologies, to the extent that such efforts have application materially related to national security and defense.

(E) Workforce and education incentives to attract and recruit leading talent in artificial intelligence and machine learning disciplines, including science, technology, engineering, and math programs.

(F) Risks associated with United States and foreign country advances in military employment of artificial intelligence and machine learning, including international law of armed conflict, international humanitarian law, and escalation dynamics.

(G) Associated ethical considerations related to artificial intelligence and machine learning as it will be used for future applications related to national security and defense.

(H) Means to establish data standards, and incentivize the sharing of open training data within related national security and defense data-driven industries.

(I) Consideration of the evolution of artificial intelligence and appropriate mechanism for managing such technology related to national security and defense.

(J) Any other matters the Commission deems relevant to the common defense of the Nation.[51]

46.    The AI Commission has organized itself into four subcommittees "focused on key areas to examine in detail":

---

[51] NDAA § 1051(b)(2).

- Working Group #1, which "is focused on how the U.S. Government, through policy reforms, incentives, or appropriations, can help accelerate academic research and commercial innovation in AI";

- Working Group #2, which "is focused on how the U.S. Government can adopt AI applications at speed and scale to protect U.S. national security, including through policy, process, governance, and organizational reforms";

- Working Group #3, which "is focused on how to overcome challenges and develop incentives to build a world-class, AI-ready national security workforce"; and

- Working Group #4, which "is considering ways to enhance U.S. global competitiveness, leverage our alliances, and establish norms that advance U.S. values and interests."[52]

47.     The AI Commission has also "decided to pursue Special Projects on three cross-cutting issues: 1) harnessing AI through public-private partnerships, 2) pursuing the responsible and ethical use of AI for national security, and 3) managing data to support AI applications."[53]

48.     According to the AI Commission, the Commission "meet[s] in plenary every other month," and "[e]ach working group meets monthly[.]"[54]

49.     The AI Commission is "supported by a professional staff of about 20, including direct hires and detailees from the military services and government agencies. The staff is organized into three teams, focused on research and analysis, outreach and engagement, and operations."[55]

---

[52] Ex. H at 2.
[53] *Id.*
[54] *Id.*
[55] *Id.* at 4.

The Transparency Obligations of the AI Commission and the DOD

50.     The AI Commission is subject to the transparency requirements of three overlapping

statutes: the NDAA, the FACA, and the FOIA. The DOD is also subject to the FOIA.

51.     Under the NDAA, the AI Commission was required to "submit to the President and

Congress" within 180 days of enactment (by February 9, 2019) "an initial report on the findings

of the Commission and such recommendations that the Commission may have for action by the

executive branch and Congress."[56]

52.     The AI Commission was also required to submit to the President and Congress an annual

"comprehensive report on the [Commission's] review" within one year of enactment (by August

13, 2019).[57] A final comprehensive report is due within two years of enactment (by August 13,

2020).[58]

53.     Notably, reports submitted by the AI Commission "shall be made public[ly] available,

but may include a classified annex."[59]

54.     Under the FACA, the AI Commission and its officers must (a) make each Commission

meeting "open to the public";[60] (b) provide "timely notice of each [Commission] meeting in the

Federal Register";[61] and (c) make "available for public inspection and copying" the "records,

reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other

documents which were made available to or prepared for or by" the Commission.[62]

---

[56] NDAA § 1051(c)(1).
[57] NDAA § 1051(c)(2).
[58] *Id.*
[59] NDAA § 1051(c)(3).
[60] 5 U.S.C. app. 2 § 10(a)(1).
[61] 5 U.S.C. app. 2 § 10(a)(2).
[62] 5 U.S.C. app. 2 § 10(b); *see also* 5 U.S.C. app. 2 § 11(a).

55.     The FACA also requires the AI Commission to "[a]llow public access to subcommittee records" and to "[c]omply with recordkeeping requirements (i.e., minutes)" with respect to its subcommittees.[63]

56.     Under the FOIA, the AI Commission and the DOD are required, "upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, [to] make the records promptly available" to the requester.[64]

57.     The AI Commission and the DOD are also required to process FOIA requests on an expedited basis "in cases in which the person requesting the records demonstrates a compelling need" and "in other cases determined by the agency."[65] A compelling need exists when there is "urgency to inform the public concerning actual or alleged Federal Government activity," so long as the "request [is] made by a person primarily engaged in disseminating information[.]"[66]

58.     The FOIA requires the AI Commission and the DOD to "make a determination of whether to provide expedited processing . . . within 10 days after the date of [a] request" and to provide "expeditious consideration of administrative appeals of such determinations[.]"[67] The AI Commission and the DOD must also "process as soon as practicable any request for records to which the agency has granted expedited processing[.]"[68]

---

[63] GSA, *Federal Advisory Committee Act Training Course* 192 (2017), https://www.governmentattic.org/24docs/GSA-FACAtrainMatls_2017.pdf; *see also* 5 U.S.C. app. 2 § 7 (making the General Services Administration "responsible for all matters relating to advisory committees" and authorizing the agency to "prescribe administrative guidelines and management controls applicable to advisory committees").
[64] 5 U.S.C. § 552(a)(3)(A).
[65] 5 U.S.C. § 552(a)(6)(E)(i).
[66] 5 U.S.C. § 552(a)(6)(E)(v)(II).
[67] 5 U.S.C. § 552(a)(6)(E)(ii).
[68] 5 U.S.C. § 552(a)(6)(E)(iii).

The Failure of the AI Commission and its Senior Officers to Comply With the FACA

59.     The AI Commission has operated almost entirely in secret. The Commission has

conducted all of its proceedings behind closed doors and has failed to publish or disclose any

notices, agendas, minutes, or materials for those meetings.

60.     On February 7, 2019—a month before the Commission's work began "in earnest"[69]—

EPIC sent a letter to members of the AI Commission urging the Commission to "provide

opportunities for public input, including public hearings" and to "issue no reports until there has

been a meaningful opportunity for public participation."[70] EPIC noted "that many governments,

including Japan, Canada, Germany, and the European Commission, have hosted important public

events to solicit public opinion to ensure a national policy on AI that reflects the public

interest."[71]

61.     On February 22, 2019, EPIC sent a FACA Request to the Department of Defense,[72]

which is responsible for funding the AI Commission.[73] Pursuant to section 10(b) of the FACA,

EPIC sought:

> (1)  Copies of all "records, reports, transcripts, minutes, appendixes, working
>      papers, drafts, studies, agenda, or other documents which were made available
>      to or prepared for or by" the National Security Commission on Artificial
>      Intelligence or any subcomponent thereof;

---

[69] Ex. H at 1.

[70] Ex. A at 1.

[71] *Id.*

[72] Ex. B at 6–7.

[73] NDAA § 1051(d) (directing that the AI Commission be funded by "not more than $10,000,000" taken from "the amounts authorized to be appropriated by [the NDAA] . . . for the Department of Defense"); Memorandum from Michele Bail, Dir., Program & Fin. Control, Dep't of Def., to Asst. Sec. of the Army, Fin. Mgmt. & Comptroller, et al. (Dec. 26, 2018) (implementing the transfer of $10,000,000 from the DOD to the AI Commission), https://comptroller.defense.gov/Portals/45/Documents/execution/reprogramming/fy2019/letter/19-05_LTR_DoD_Directed_Transfer_Commission_Artificial_Intelligence.pdf.

(2) A copy of the "initial report on the findings and . . . recommendations" of the National Security Commission on Artificial Intelligence required by section 1051(c)(1) of the National Defense Authorization Act for FY 2019; and

(3) Access to, and advance Federal Register notice of, all meetings of the National Security Commission on Artificial Intelligence and any subcomponent thereof.[74]

62.     The DOD acknowledged receipt of EPIC's February 22 FACA Request by letter dated February 28, 2019.[75] However, the DOD failed to provide a substantive response to EPIC's FACA Request.

63.     On March 11, 2019, the AI Commission held its first plenary meeting in Arlington, Virginia.[76] The Commission did not publish a notice in the Federal Register or otherwise provide the public with an opportunity to participate in the meeting. Only after the fact—in a March 12, 2019 press release—did the Commission acknowledge that the March 11 meeting had occurred.[77]

64.     Little is publicly known about the substance of the AI Commission's March 11 meeting. The Commission has stated that it "received briefs from the Defense and Commerce departments, the intelligence community, and Members of Congress,"[78] including Sen. Martin Heinrich, Rep. Elise Stefanik, and Rep. Jerry McNerney.[79]

65.     Commissioners also established the AI Commission's four working groups during the March 11 meeting.[80]

---

[74] Ex. B at 6.
[75] Ex. C.
[76] Ex. H at 1.
[77] Ex. D.
[78] *Id.*
[79] Ex. H at 1.
[80] *Id.* at 2.

66.     Although the working groups have held at least nine meetings to date,[81] the Commission has failed to publicly disclose the dates, locations, or contents of those meetings.

67.     On May 20, 2019, the AI Commission held its second plenary meeting in Cupertino, California.[82] The Commission did not publish a notice in the Federal Register or otherwise announce the meeting in advance. Only nine days after the fact—in a May 29, 2019 press release—did the Commission acknowledge that the May 20 meeting had occurred.[83]

68.     The AI Commission has not disclosed the details of its May 20 meeting to EPIC or the public. The Commission has stated only that it "received classified briefs on the status of the U.S. government's artificial intelligence strategies and examined overseas trends,"[84] and that it was "briefed on U.S. Government policies and perspectives, including from the White House Office of Science and Technology Policy, the National Security Council, and the Defense Department's Office of Net Assessment."[85]

69.     On July 11, 2019, the AI Commission held its third plenary meeting in Cupertino, California.[86] The Commission did not publish a notice in the Federal Register or otherwise announce the meeting in advance. Only after the fact—in a July 12, 2019 press release—did the Commission acknowledge that the July 11 meeting had occurred.[87]

70.     The AI Commission has not disclosed the details of its July 11 meeting to EPIC or the public. The Commission stated that it "examined the AI landscape" and "received classified briefings on counterintelligence threats and challenges to the United States as well as

---

[81] *Id*.
[82] *Id*. at 1–2.
[83] Ex. F.
[84] *Id*.
[85] Ex. H at 2.
[86] *Id*.
[87] Ex. G.

opportunities to advance U.S. leadership in artificial intelligence."[88] The meeting "featured briefings from the Intelligence Community, the Federal Bureau of Investigation, and the National Security Council."[89]

71.     On July 15, 2019, C4ISRNET published an article calling attention to the AI Commission's lack of transparency.[90] "Absent from the [Commission's July 12 press] release is any information about the specifics of the reports, assessments, working group evaluations or briefings," staff writer Kelsey D. Atherton wrote.[91] "Companies or members of the public interested in learning how the Commission is studying AI are left only with the knowledge that appointed people met to discuss these very topics, did so, and are not yet releasing any information about their recommendations."[92]

72.     On July 17, 2019, Chairman Schmidt and Vice Chairman Work published an article in *War on the Rocks*, a private publication focused on foreign policy and national security issues.[93] The Chairman and Vice Chairman of the AI Commission called for papers in response to one of five "prompts" determined by the Commission—but only papers consistent with the lengthy submission guidelines of *War on the Rocks*.[94] The article contained no details about future meetings of the Commission and made no provision for public comment on other subjects.

---

[88] *Id.*
[89] Ex. H at 2.
[90] Kelsey D. Atherton, *Why Won't the National Security Commission Share its Thoughts on AI?*, C4ISRNET (July 15, 2019), https://www.c4isrnet.com/artificial-intelligence/2019/07/15/national-security-commission-on-ai-meets-again/.
[91] *Id.*
[92] *Id.*
[93] Robert Work & Eric Schmidt, *In Search of Ideas: The National Security Commission on Artificial Intelligence Wants You*, War on the Rocks (July 18, 2019), https://warontherocks.com/2019/07/in-search-of-ideas-the-national-security-commission-on-artificial-intelligence-wants-you/. War on The Rocks describes itself as "For insiders. By insiders." *Id.*
[94] *Id.*

73.     No similar request for information was provided on the website of the AI Commission, in the Federal Register, or elsewhere.

74.     The article in *War on the Rocks* also revealed, for the first time, that the Commission "includes four working groups and three special projects" and that the "[t]he three special projects address ethics, data, and public-private partnerships."[95]

75.     On July 31, 2019, the AI Commission submitted its Initial Report to Congress—more than five months after the February 9 statutory deadline. The four-page document briefly summarized the "[i]nitial [a]ctivities" of the AI Commission; broadly described the relationship of the Commission to industry, academia, and other federal AI efforts; and included two bullet points on the Commission's "[n]ext [s]teps."[96]

76.     The AI Commission's Initial Report to Congress is hosted on a Google server with a Google Drive URL as the filename.[97]

77.     The Chairman of the AI Commission was CEO of Google Inc. from 2001 to 2011; executive chairman of Google Inc. from 2011 to 2015; and executive chairman of Alphabet Inc., Google's parent company, from 2015 to 2017.

78.     The Initial Report was published contemporaneously with the launch of the Commission's website, which consists almost exclusively of Commission member biographies,

---

[95] *Id.*
[96] Ex. H at 1–4.
[97] Nat'l Sec. Comm'n on Artificial Intelligence, *Initial Report* (July 2019), https://drive.google.com/file/d/1wRGmHgKURwkTUeusOrHA4gAStFwFSAdE/view. *Contra* Nat'l Comm'n on Terrorist Attacks Upon the U.S., *The 9/11 Commission Report* (2002), https://www.9-11commission.gov/report/; GSA, *The Presidential Commission on Election Integrity (PCEI); Upcoming Public Advisory Meeting* (Aug. 24, 2017), https://www.whitehouse.gov/sites/whitehouse.gov/files/GSA-1612-PACEI-Public_Viewing_FR_08.24.2017.pdf.

post-hoc press releases about Commission meetings, and a copy of the Initial Report.[98] The

website contains no meeting agendas, minutes, or materials.

79.     On August 13, 2019, the statutory deadline for the AI Commission's first

"comprehensive report" passed.[99] The Commission has not yet issued that report.

80.     On September 11, 2019—after six months of closed AI Commission proceedings—EPIC

sent a renewed FACA Request to the AI Commission via email.[100] Pursuant to section 10(b) of

the FACA, EPIC sought:

> (1)   Copies of all "records, reports, transcripts, minutes, appendixes, working
>        papers, drafts, studies, agenda, or other documents which were made available
>        to or prepared for or by" the National Security Commission on Artificial
>        Intelligence and/or any subcomponent thereof;
>
> (2)   Contemporaneous access to, and advance Federal Register notice of, all
>        meetings of the National Security Commission on Artificial Intelligence and
>        any subcomponent thereof, including but not limited to the Commission's
>        September 2019 and November 2019 plenary meetings.[101]

81.     The AI Commission acknowledged receipt of EPIC's September 11 FACA Request by

email dated September 12, 2019.[102]

82.     Between September 18 and September 19, 2019, the AI Commission held another

meeting in Arlington, Virginia.[103] The Commission did not publish a notice in the Federal

Register or otherwise announce the meeting in advance.

---

[98] *National Security Commission on Artificial Intelligence* (2019), https://www.nscai.gov/.
[99] NDAA § 1051(c)(2).
[100] Ex. I.
[101] *Id.* at 11.
[102] Ex. J.
[103] U.S. Dep't of State, *Public Schedule – September 19, 2019* (Sep. 19, 2019),
https://www.state.gov/public-schedule-september-19-2019/ ("Under Secretary Thompson
delivers remarks at the National Security Commission on Artificial Intelligence, in Arlington,
Virginia."); Charlotte Stanton (@CharlotteStant) (Sep. 19, 2019, 12:17 PM),
https://twitter.com/CharlotteStant/status/1174719245579481088 ("Really enjoyed briefing the

83.     The AI Commission has not disclosed the details of its September 19 meeting to EPIC or the public. The Commission has yet to publicly acknowledge that the meeting occurred.

84.     To date, the AI Commission has not disclosed the records EPIC seeks pursuant to the FACA.

85.     To date, the AI Commission has not given advanced Federal Register notice of any of the Commission's meetings.

86.     To date, the AI Commission has only offered EPIC access to a single official Commission event: a conference scheduled for November 5, 2019 and "held in conjunction with the submission of NSCAI's interim report to Congress[.]"[104]

87.     The AI Commission has not announced any plenary or working group meetings prior to the Commission's completion of its interim report to Congress.

<u>The Failure of the AI Commission to Comply With the FOIA</u>

88.     On September 11, 2019, EPIC submitted a FOIA Request via email to the AI Commission.[105] EPIC requested "[a]ll records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by the National Security Commission on Artificial Intelligence or any subcomponent thereof."[106]

---

U.S. National Commission on #ArtificialIntelligence yesterday about our study: What the Machine Learning Value Chain Means for Geopolitics http://ceip.org/p-79631 #NSCAI").
[104] Ex. K; *see also* NSCAI, *Strength Through Innovation* (Sep. 2019), https://www.nscai.gov/conference_1.
[105] Ex. I.
[106] *Id.* at 1.

89.     EPIC sought expedited processing of its FOIA Request. EPIC explained that there was an "urgency to inform the public about an actual or alleged Federal Government activity'" and that the request was "made by a person who is primarily engaged in disseminating information."[107]

90.     As EPIC stated in its FOIA Request:

> It is 'urgen[t] to inform the public' about the activities of the AI Commission because the Commission has disclosed extremely scant information about its proceedings—even as the Commission continues to issue reports, formulate recommendations, hold meetings, and receive briefings. Indeed, although the Commission claims that it will issue its first comprehensive report in just over two months, it has failed to release a single page of meeting minutes, agendas, or materials to date. It is urgent that the requested information be released to the public before the Commission's next scheduled meeting and the issuance of its first comprehensive report.[108]

91.     EPIC further explained that "[t]he Commission's findings and recommendations, which must by law be delivered to the President and Congress, will have significant influence on the White House's initiative and on AI policy generally."[109]

92.     EPIC also stated that it is "an organization 'primarily engaged in disseminating information'"[110]—and is thereby entitled to expedited processing of its FOIA Request—because EPIC qualifies as "'a representative of the news media.'"[111]

93.     Finally, EPIC explained that it is entitled to "news media" fee status and a waiver of all duplication fees.[112]

94.     The AI Commission acknowledged receipt of EPIC's September 11 FOIA Request by email dated September 12, 2019.[113]

---

[107] *Id.* at 8 (quoting 5 U.S.C § 552(a)(6)(E)(v)(II)).
[108] *Id.* at 8–9.
[109] *Id.* at 9.
[110] *Id.* (quoting 5 U.S.C. § 552(a)(6)(E)(v)(II)).
[111] *Id.* (quoting *EPIC v. DOD*, 241 F. Supp. 2d 5, 15 (D.D.C. 2003)).
[112] *Id.* at 9–10.
[113] Ex. J.

95.     Today—September 27, 2019—is the sixteenth calendar day since the AI Commission received EPIC's FOIA Request.

96.     The AI Commission has not made a determination on EPIC's FOIA Request.

97.     The AI Commission has not made a determination on EPIC's request for expedited processing within the ten-day period allowed by 5 U.S.C. § 552(a)(6)(E)(ii)(I).

98.     Accordingly, EPIC has constructively exhausted administrative remedies under 5 U.S.C. § 552(a)(6)(C)(i).

<u>The Failure of the DOD to Comply With the FOIA</u>

99.     Nearly seven months earlier—on February 22, 2019—EPIC submitted a FOIA Request via email to the DOD.[114] EPIC requested:

> (1)  All records concerning the creation of the National Security Commission on Artificial Intelligence;
>
> (2)  All records—including but not limited to reports, agendas, meeting minutes, transcripts, working papers, drafts, studies, and notices of proposed meetings scheduled to be published in the Federal Register—arising from or related to the National Security Commission on Artificial Intelligence; and
>
> (3)  The "initial report on the findings and . . . recommendations" of the National Security Commission on Artificial Intelligence, required by section 1051(c)(1) of the National Defense Authorization Act for FY 2019, due on February 9, 2019.[115]

100.    EPIC sought expedited processing of its FOIA Request. EPIC explained that there was an "urgency to inform the public about an actual or alleged Federal Government activity'" and that the request was "made by a person who is primarily engaged in disseminating information."[116]

---

[114] Ex. B.
[115] *Id.* at 1.
[116] *Id.* at 4 (quoting 5 U.S.C § 552(a)(6)(E)(v)(II)).

101.   As EPIC stated in its FOIA Request:

It is "urgen[t] to inform the public" about the activities of the AI Commission because the AI Commission's initial report on its findings and recommendations was due on February 9, 2019. The report must be made publicly available, yet there is no indication that the report has been published or even submitted to the President and the Congress. Moreover, the AI Commission is led by technologists, executives of major technology firms, and former federal officials, and the Commission is operating at a time when the White House has launched the "American AI Initiative." The AI Commission's findings, recommendations, and proceedings will therefore have significant influence on AI policymaking by both Congress and the executive branch. The public urgently needs to be informed of the activities of the AI Commission.[117]

102.   EPIC also stated that it is "an organization 'primarily engaged in disseminating information'"[118]—and is thereby entitled to expedited processing of its FOIA Request—because EPIC qualifies as "a representative of the news media."[119]

103.   Finally, EPIC explained that it is entitled to "news media" fee status and a waiver of all duplication fees.[120]

104.   The DOD acknowledged receipt of EPIC's February 22 FOIA Request by letter dated February 28, 2019.[121]

105.   In the letter, that DOD stated that it would deny EPIC's request for expedited processing.[122]

106.   Today—September 27, 2019—is the 151st working day since the DOD received EPIC's FOIA Request.

107.   The DOD has not made a determination on EPIC's FOIA Request.

---

[117] *Id.*
[118] *Id.* at 5 (quoting 5 U.S.C § 552(a)(6)(E)(v)(II)).
[119] *Id.* (quoting *EPIC*, 241 F. Supp. 2d at 15).
[120] *Id.* at 5–6.
[121] Ex. C.
[122] *Id.* at 1.

108.    On April 30, 2019, EPIC filed a timely administrative appeal of the DOD's denial of expedited processing.[123] EPIC reiterated the grounds for expedition set forth in EPIC's February 22 FOIA Request.[124]

109.    Today— September 27, 2019—is approximately the 104th working day since the DOD received EPIC's FOIA Appeal concerning the agency's denial of expedited processing.

110.    The DOD has not made a determination regarding EPIC's FOIA Appeal within the time period required by 5 U.S.C. §§ 552(a)(6)(A)(ii) and (E)(ii)(II).

111.    Accordingly, EPIC has constructively exhausted all administrative remedies under 5 U.S.C. § 552(a)(6)(C)(i).

## Count I

**Violation of the FACA: Failure to Open Meetings to the Public**
*Defendants AI Commission, Eric Schmidt, and Ylli Bajraktari*

112.    Plaintiff asserts and incorporates by reference paragraphs 1–111.

113.    Defendants AI Commission, Eric Schmidt, and Ylli Bajraktari have failed to timely notice and open the meetings of the Commission to the public.

114.    Plaintiff sought to participate in the meetings of the AI Commission but was prevented from doing so by Defendants' failure to timely notice and open those meetings.

115.    Defendants' failure to timely notice and open AI Commission meetings violates 5 U.S.C. app. 2 §§ 10(a)(1) and (a)(2) and constitutes a failure to perform duties owed to EPIC within the meaning of 28 U.S.C. § 1361.

116.    Plaintiff is adversely affected, aggrieved, and injured in fact by Defendants' violations of 5 U.S.C. app. 2 §§ 10(a)(1) and (a)(2). By failing to timely notice and open AI Commission

---

[123] Ex. E.
[124] *Id.* at 2–5.

meetings, Defendants have frustrated Plaintiff's longstanding mission to educate the public about the privacy and human rights risks of AI technology and the federal government's efforts (or lack thereof) to mitigate those risks.

117.    Plaintiff has exhausted all applicable administrative remedies.

118.    Plaintiff is entitled to a writ of mandamus compelling Defendants AI Commission, Eric Schmidt, and Ylli Bajraktari to timely notice and open the meetings of the Commission to EPIC and the public.

## Count II

### Violation of the APA: Agency Action Unlawfully Withheld
*Defendant AI Commission*

119.    Plaintiff asserts and incorporates by reference paragraphs 1–111.

120.    Defendant AI Commission has failed to timely notice and open the meetings of the Commission to the public, as required by 5 U.S.C. app. 2 §§ 10(a)(1) and (a)(2).

121.    Plaintiff sought to participate in the meetings of the AI Commission but was prevented from doing so by Defendant's failure to timely notice and open those meetings.

122.    Defendant's failure to timely notice and open AI Commission meetings constitutes agency action unlawfully withheld or unreasonably delayed in violation of 5 U.S.C. § 706(1).

123.    Plaintiff is adversely affected, aggrieved, and injured in fact by Defendant's violations of 5 U.S.C. § 706(1). By failing to timely notice open AI Commission meetings, Defendant AI Commission has frustrated Plaintiff's longstanding mission to educate the public about the privacy and human rights risks of AI technology and the federal government's efforts (or lack thereof) to mitigate those risks.

124.    Plaintiff has exhausted all applicable administrative remedies.

125.     Plaintiff is entitled to injunctive relief compelling Defendant AI Commission to timely

notice and open the meetings of the Commission to EPIC and the public.

## Count III

### Violation of the APA: Unlawful Agency Action
*Defendant AI Commission*

126.     Plaintiff asserts and incorporates by reference paragraphs 1–111.

127.     Defendant AI Commission has held numerous non-noticed, nonpublic meetings in

violation of 5 U.S.C. app. 2 §§ 10(a)(1) and (a)(2).

128.     Plaintiff sought to participate in the meetings of the AI Commission but was prevented

from doing so by Defendant's nondisclosure of required meeting information.

129.     By holding non-noticed, nonpublic meetings, Defendant AI Commission has engaged in

conduct that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law under 5 U.S.C. § 706(2)(A); short of statutory right under 5 U.S.C. § 706(2)(C); and without

observance of procedure required by law under 5 U.S.C. § 706(2)(D).

130.     Defendants' conduct constitutes final agency action under 5 U.S.C. § 704.

131.     Plaintiff is adversely affected, aggrieved, and injured in fact by Defendant's violations of

5 U.S.C. § 706(2). By holding non-noticed, nonpublic AI Commission meetings, Defendant AI

Commission has frustrated Plaintiff's longstanding mission to educate the public about the

privacy and human rights risks of AI technology and the federal government's efforts (or lack

thereof) to mitigate those risks.

132.     Plaintiff has exhausted all applicable administrative remedies.

133.     Plaintiff is entitled to injunctive relief prohibiting Defendant AI Commission from

holding non-noticed, nonpublic Commission meetings.

## Count IV

**Violation of the FACA: Failure to Make Records Available for Public Inspection**
*Defendants AI Commission, Eric Schmidt, and Ylli Bajraktari*

134.    Plaintiff asserts and incorporates by reference paragraphs 1–111.

135.    Defendants AI Commission, Eric Schmidt, and Ylli Bajraktari have failed to make "available for public inspection and copying" numerous "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by" the Commission, including but not limited to records arising out of the Commission's working groups and special projects. 5 U.S.C. app. 2 § 10(b).

136.    Defendants' failure to make these records available for inspection and copying is a violation of 5 U.S.C. app. 2 § 10(b) and constitutes a failure to perform a duty owed to EPIC within the meaning of 28 U.S.C. § 1361.

137.    Plaintiff is adversely affected, aggrieved, and injured in fact by Defendants' violation of 5 U.S.C. app. 2 § 10(b). By failing to make numerous AI Commission records available for public inspection, Defendants have frustrated Plaintiff's longstanding mission to educate the public about the privacy and human rights risks of AI technology and the federal government's efforts (or lack thereof) to mitigate those risks.

138.    Plaintiff has exhausted all applicable administrative remedies.

139.    Plaintiff is entitled to a writ of mandamus compelling Defendants AI Commission, Eric Schmidt, and Ylli Bajraktari to make available for copying and inspection the Commission records described by 5 U.S.C. app. 2 § 10(b).

## Count V

### Violation of the APA: Agency Action Unlawfully Withheld
*Defendant AI Commission*

140.    Plaintiff asserts and incorporates by reference paragraphs 1–111.

141.    Defendant AI Commission has failed to make "available for public inspection and copying" numerous "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by" the Commission, including but not limited to records arising out of the Commission's working groups and special projects. 5 U.S.C. app. 2 § 10(b).

142.    Defendant's failure to make these records available to Plaintiff constitutes agency action unlawfully withheld or unreasonably delayed in violation of 5 U.S.C. § 706(1).

143.    Plaintiff is adversely affected, aggrieved, and injured in fact by Defendant's violation of 5 U.S.C. § 706(1). By failing to make numerous AI Commission records available for public inspection, Defendant AI Commission has frustrated Plaintiff's longstanding mission to educate the public about the privacy and human rights risks of AI technology and the federal government's efforts (or lack thereof) to mitigate those risks.

144.    Plaintiff has exhausted all applicable administrative remedies.

145.    Plaintiff is entitled to injunctive relief compelling Defendant AI Commission to open the meetings of the Commission to EPIC and the public.

## Count VI

### Violation of the FOIA: Failure to Comply with Statutory Deadlines
*Defendants AI Commission and DOD*

146.    Plaintiff EPIC asserts and incorporates by reference paragraphs 1–111.

147.    Defendant AI Commission, by failing to make a determination regarding EPIC's

September 11, 2019 FOIA Request, has violated the deadlines set forth in 5 U.S.C. §

552(a)(6)(A)(i) and 5 U.S.C. § 552(a)(6)(B)(i).

148.    Defendant AI Commission, by failing to make a determination regarding EPIC's request

for expedited processing, has violated the deadline set forth in 5 U.S.C. § 552(a)(6)(E)(ii)(I).

149.    Defendant DOD, by failing to make a determination regarding EPIC's February 22, 2019

FOIA Request, has violated the deadlines set forth in 5 U.S.C. § 552(a)(6)(A)(i) and 5 U.S.C. §

552(a)(6)(B)(i).

150.    Defendant DOD, by failing to make a determination on EPIC's April 30, 2019 FOIA

Appeal, has violated the deadlines set forth in 5 U.S.C. § 552(a)(6)(A)(ii) and 5 U.S.C. §

552(a)(6)(E)(ii)(II).

151.    Plaintiff EPIC has constructively exhausted all applicable administrative remedies under

5 U.S.C. § 552(a)(6)(C)(i) with respect to EPIC's FOIA Requests and FOIA Appeal.

152.    Plaintiff is entitled to injunctive relief with respect to the processing of EPIC's FOIA

Requests and FOIA Appeal and the disclosure of the requested records.

## Count VII

### Violation of the FOIA: Unlawful Denial of Expedited Processing
*Defendants AI Commission and DOD*

153.    Plaintiff asserts and incorporates by reference paragraphs 1–111.

154.    Defendant AI Commission has constructively and wrongfully denied expedited

processing of EPIC's September 11, 2019 FOIA Request in violation of 5 U.S.C. § 552(a)(6)(E).

155.    Defendant DOD has wrongfully denied expedited processing of EPIC's February 22,

2019 FOIA Request in violation of 5 U.S.C. § 552(a)(6)(E).

156.     Defendant DOD has wrongfully failed to make a determination on EPIC's April 30, 2019 FOIA Appeal in violation of 5 U.S.C. § 552(a)(6)(E)(ii)(II) and 5 U.S.C. § 552(a)(6)(A)(ii).

157.     Plaintiff has constructively exhausted applicable administrative remedies under 5 U.S.C. § 552(a)(6)(C)(i) with respect to expedited processing of EPIC's FOIA Requests.

158.     Plaintiff is entitled to injunctive relief requiring expedited processing of EPIC's FOIA Requests.

### Count VIII

**Violation of the FOIA: Unlawful Withholding of Agency Records**
*Defendants AI Commission and DOD*

159.     Plaintiff asserts and incorporates by reference paragraphs 1–111.

160.     Defendant AI Commission has wrongfully withheld agency records requested by EPIC.

161.     Defendant DOD has wrongfully withheld agency records requested by EPIC.

162.     Plaintiff has constructively exhausted applicable administrative remedies under 5 U.S.C. § 552(a)(6)(C)(i) with respect to both of EPIC's FOIA Requests.

163.     Plaintiff is entitled to injunctive relief with respect to the release and disclosure of the requested records.

### Requested Relief

WHEREFORE, Plaintiff requests that this Court:

   A.  Issue an injunction and/or a writ of mandamus compelling Defendants AI Commission, Eric Schmidt, and Ylli Bajraktari to timely notice and open to the public all Commission meetings;

   B.  Issue an injunction prohibiting the AI Commission from holding Commission meetings absent timely notice;

C.  Issue an injunction prohibiting the AI Commission from holding non-public Commission meetings;

D.  Issue an injunction and/or a writ of mandamus compelling Defendants AI Commission, Eric Schmidt, and Ylli Bajraktari to make available for inspection and copying all records prepared for or by the Commission, including but not limited to records arising out of the Commission's working groups and special projects;

E.  Order the AI Commission and DOD to process EPIC's FOIA Requests on an expedited basis;

F.  Order the AI Commission and DOD to immediately conduct searches for all records responsive to EPIC's FOIA Requests;

G.  Order the AI Commission and DOD to disclose all nonexempt records responsive to EPIC's FOIA Requests;

H.  Issue a declaration of the rights and other legal relations of the parties under 28 U.S.C. § 2201(a) with respect to all claims;

I.  Award EPIC costs and reasonable attorney's fees incurred in this action; and

J.  Grant such other relief as the Court may deem just and proper.


Respectfully Submitted,

MARC ROTENBERG, D.C. Bar #422825
EPIC President and Executive Director

ALAN BUTLER, D.C. Bar #1012128
EPIC Senior Counsel

/s/ John L. Davisson
JOHN L. DAVISSON, D.C. Bar #1531914
EPIC Counsel

ELENI KYRIAKIDES, D.C. Bar #155276
EPIC International Counsel

ELECTRONIC PRIVACY
INFORMATION CENTER
1519 New Hampshire Ave, N.W.
Washington, D.C. 20036
(202) 483-1140 (telephone)
(202) 483-1248 (facsimile)

*Attorneys for Plaintiff EPIC*

Dated: September 27, 2019