**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**ELECTRONIC PRIVACY INFORMATION CENTER**,

Plaintiff,

v.

**NATIONAL SECURITY COMMISSION ON ARTIFICIAL INTELLIGENCE**, *et al.*,

Defendants.

Case No. 1:19-cv-02906 (TNM)

---

## MEMORANDUM OPINION

The Roman god Janus famously has two faces. One looks backward, toward the past; the other looks forward, toward the future. Mythologists understand his two-faced depiction as complementary, not contradictory.[1] It means that every beginning has an ending, every ending a beginning. Like a doorway, Janus looks both ways.

So, too, with our Nation's open government laws. In general, the Freedom of Information Act ("FOIA") is backward looking, requiring agencies to disclose historical documents kept by the agency upon request from a private party. Under the Federal Advisory Committee Act ("FACA"), certain federal advisory bodies are subject to forward-looking publication requirements, such as giving notice of their meetings, opening them to the public, and proactively making their records publicly available. But can the same body be subject to both laws?

---

[1] Donald L. Wasson, *Janus*, Ancient History Encyclopedia (Feb. 6, 2015), https://www.ancient.eu/Janus/.

The Court previously held that the National Security Commission on Artificial Intelligence is an agency subject to FOIA. *EPIC v. Nat'l Sec. Comm'n on Artificial Intelligence* ("*NSCAI*"), 419 F. Supp. 3d 82, 83 (D.D.C. 2019). Given that holding, the Commission now argues that it cannot possibly also be subject to FACA's forward-looking disclosure obligations. Today, the Court holds that, like Janus, the Commission does indeed have two faces, and that Congress obligated it to comply with FACA as well as FOIA.

The Electronic Privacy Information Center ("EPIC") sued to enforce the Commission's obligations under both FOIA and FACA. The Court denied the Government's motion to dismiss the FOIA claims. *Id.* The Government now moves to dismiss EPIC's FACA claims and its related claims under the Administrative Procedure Act ("APA"). EPIC moves for summary judgment on these counts. While the Court will dismiss the APA claims for lack of jurisdiction, it will grant summary judgment for EPIC on its FACA claims.

## I.

The Court's previous opinion provides background on the Commission and EPIC's suit. *See NSCAI*, 419 F. Supp. 3d at 83–85. A quick refresher is in order.

Two years ago, Congress "established in the executive branch an independent Commission to review advances in artificial intelligence, related machine learning developments, and associated technologies." John S. McCain National Defense Authorization Act for Fiscal Year 2019 ("2019 NDAA"), Pub. L. No. 115-232, § 1051(a)(1), 132 Stat. 1636, 1962 (2018). The Commission is "a temporary organization" under 5 U.S.C. § 3161. *Id.* § 1051(a)(2). Its 15 members are "appointed for the life of the Commission" and are "Federal employees." *Id.* § 1051(a)(4)(A), (6)–(7).

Congress instructed the Commission to "consider the methods and means necessary to advance the development of artificial intelligence . . . to comprehensively address the national security and defense needs of the United States." *Id.* § 1051(b)(1).  The Commission must report its findings and recommendations to the President and Congress.  *Id.* § 1051(c)(1).

The Commission was originally set to end this October, but Congress recently extended its life by a year.  *See* National Defense Authorization Act for Fiscal Year 2020 ("2020 NDAA"), Pub. L. No. 116-92, § 1735(a), 133 Stat. 1198, 1819 (2019).  Its next interim report is due by this December and a final report is due next March.  *Id.* § 1735(c)(2)–(3).

From its inception, the Commission "has operated almost entirely in secret."  Compl. ¶ 59, ECF No. 1.  It has held several meetings "behind closed doors" and "has failed to publish or disclose any notices, agendas, minutes, or materials for those meetings."  *Id.* ¶¶ 38, 59.

Last September, EPIC sent a request to the Commission, invoking FOIA and section 10 of FACA, 5 U.S.C. app. 2.  Pl.'s Mot. Exs. at 31,[2] ECF No. 31-4.  Under FACA, it sought "[c]ontemporaneous access to, and advance Federal Register notice of, all meetings" of the Commission "and any subcomponent thereof."  *Id.* (citing 5 U.S.C. app. 2 § 10(a)).  It also asked for "[c]opies of all 'records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda[s], or other documents which were made available to or prepared for or by'" the Commission "and/or any subcomponent thereof."  *Id.* (quoting 5 U.S.C. app. 2 § 10(b)).  The Commission acknowledged the request but did not otherwise respond.  *Id.* at 34.

Two weeks later, EPIC sued.  It brought claims under FACA (Counts I and IV), the APA (Counts II, III, and V), and FOIA (Counts VI, VII, and VIII).  Compl. ¶¶ 112–63.  It simultaneously moved for a preliminary injunction on its FOIA claims.  Mot. for Prelim. Inj. at

---

[2]  All page citations refer to the page numbers that the CM/ECF system generates.

1, ECF No. 4.  The Court denied the motion, finding that EPIC had failed to show irreparable harm.  Tr. of Prelim. Inj. Hr'g at 46–47, ECF No. 22.

The Government then moved to dismiss EPIC's FOIA claims, mainly arguing that the Commission is not an "agency" subject to FOIA, *see* 5 U.S.C. § 552(f)(1).  The Court rejected that argument.  *NSCAI*, 419 F. Supp. 3d at 83.  The Commission has since begun producing records under FOIA.  Joint Status Report at 2, ECF No. 34.

The Government now moves to dismiss EPIC's FACA and APA claims.  Defs.' Mot. at 1, ECF No. 28.  These claims are linked, since the APA claims hinge on alleged violations of FACA.  Counts II and III assert that the Commission's failure to give notice of its meetings and to open them to the public, *see* 5 U.S.C. app. 2 § 10(a), violates the APA.  Compl. ¶¶ 122, 129.  Count V claims that the Commission's failure to make its records publicly available, *see* 5 U.S.C. app. 2 § 10(b), likewise violates the APA.  Compl. ¶ 142.  All three counts seek injunctive relief under the APA.  *Id.* ¶¶ 125, 133, 145.

In Counts I and IV, EPIC invokes FACA and the Mandamus Act, 28 U.S.C. § 1361.  Like the APA claims, these counts focus on two sets of alleged FACA violations:  (1) the Commission's failure to give notice of its meetings and to open them to the public; and (2) the Commission's failure to make its records publicly available.  *Id.* ¶¶ 115, 136.  EPIC seeks writs of mandamus compelling the Commission to comply with FACA.  *Id.* ¶¶ 118, 139.

EPIC responds to the Government's motion by moving for summary judgment on the FACA and APA claims.  Pl.'s Mot. at 1, ECF No. 31.  Both motions are ripe for disposition.

## II.

The Government's motion to dismiss invokes Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Defs.' Mot. at 1.  To survive a Rule 12(b)(1) motion, a plaintiff must establish the

Court's jurisdiction over its claims.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

The Court must "assume the truth of all material factual allegations in the complaint and

construe the complaint liberally, granting plaintiff the benefit of all inferences that can be

derived from the facts alleged."  *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir.

2011) (cleaned up).

To defeat a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is

plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court must "treat the

complaint's factual allegations as true and must grant the plaintiff[] the benefit of all inferences

that can be derived from the facts alleged."  *L. Xia v. Tillerson*, 865 F.3d 643, 649 (D.C. Cir.

2017) (cleaned up).  But the Court need not credit legal conclusions couched as factual

allegations.  *Iqbal*, 556 U.S. at 678.

Summary judgment for EPIC is appropriate if it shows that "there is no genuine dispute

as to any material fact and [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

A fact is "material" if it "might affect the outcome of the suit under the governing law" and a

dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must

view the evidence "in the light most favorable to the non-moving party."  *Brubaker v. Metro.

Life Ins. Co.*, 482 F.3d 586, 588 (D.C. Cir. 2007).

### III.

### A.

The heart of the dispute here is whether the Commission is an "advisory committee"

subject to FACA.  But before resolving that, the Court must address some threshold issues.

To start, the Court will dismiss EPIC's APA claims for lack of jurisdiction. "Absent a waiver of sovereign immunity, the Federal Government is immune from suit." *Loeffler v. Frank*, 486 U.S. 549, 554 (1988). The APA waives sovereign immunity when a party seeks relief against an "agency," as defined in 5 U.S.C. § 701(b)(1). *See* 5 U.S.C. § 702; *Trudeau v. FTC*, 456 F.3d 178, 187 & n.13 (D.C. Cir. 2006). If an entity is not an "agency" under § 701(b)(1), the waiver does not apply and the Court lacks jurisdiction over any APA claims against that entity. *Trudeau*, 456 F.3d at 187 & n.13; *see FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature."). So the Court must first determine whether the Commission is an "agency" under § 701(b)(1). *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 98 (1998) (affirming "the necessity of determining jurisdiction before proceeding to the merits").

Both parties assume the Court's previous opinion answered this question in the affirmative. *See* Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.") at 14, 16 n.2, ECF No. 28-1; Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 28, ECF No. 31-1. But they are mistaken. The opinion did not hold that the Commission is an "agency" under § 701(b)(1). It held only that the Commission is an "agency" for purposes of FOIA, 5 U.S.C. § 552(f)(1). The APA and FOIA define "agency" differently. The APA defines an agency as "each authority of the Government." 5 U.S.C. §§ 551(1), 701(b)(1). FOIA incorporates this definition but also expands it: "'agency' as defined in [5 U.S.C. § 551(1)] includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." *Id.* § 552(f)(1).

The chronology behind these definitions is key.  Before 1974, "each authority of the Government" was the sole definition of "agency" for *both* the APA and FOIA.  *See id.* § 551(1) (stating that the APA's definition of "agency" applies "[f]or the purpose of this subchapter," which includes FOIA, 5 U.S.C. § 552); *Energy Research Found. v. Def. Nuclear Facilities Safety Bd.*, 917 F.2d 581, 583 (D.C. Cir. 1990).  During this period, the D.C. Circuit interpreted the phrase "each authority of the Government" in § 551(1) to mean "any administrative unit with substantial independent authority in the exercise of specific functions."  *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971).[3]  So for a few years, *Soucie* supplied the sole test for "agency" status under FOIA.  *See Energy Research*, 917 F.2d at 584.

The landscape changed in 1974, when Congress amended FOIA and expanded its definition of "agency."  Pub. L. No. 93-502, § 3, 88 Stat. 1561, 1564 (1974); *Energy Research*, 917 F.2d at 583.  The 1974 amendment is currently codified at 5 U.S.C. § 552(f)(1).

The definition of "agency" in § 552(f)(1) applies only "[f]or purposes of this section," so it is exclusive to FOIA.  5 U.S.C. § 552(f)(1).  Indeed, with the language in § 552(f)(1), "Congress sought to encompass entities that might have eluded the APA's definition in § 551(1)."  *Energy Research*, 917 F.2d at 583.  The upshot is that if an entity fits one of the categories in § 552(f)(1)—such as "establishment in the executive branch"—it will not

---

[3] Though *Soucie* cited only § 551(1), *see* 448 F.2d at 1073 n.13, its interpretation applies equally to the identical phrase in § 701(b)(1).  *See Ralpho v. Bell*, 569 F.2d 607, 616 & n.54 (D.C. Cir. 1977) (citing *Soucie*, among other authorities, in concluding that the Micronesian Claims Commission is an "agency" under § 701(b)(1)); *Flaherty v. Ross*, 373 F. Supp. 3d 97, 104 & n.2 (D.D.C. 2019); *see also* Pl.'s Reply at 6 & n.1, ECF No. 35.  This accords with the canon that a phrase—here, "authority of the Government"—"is presumed to bear the same meaning throughout a text."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012).  Thus, under *Soucie*, the touchstone of "agency" status under § 701(b)(1) is the exercise of "substantial independent authority."

necessarily qualify as an "authority of the Government" under § 551(1) and § 701(b)(1).  *See id.* at 583–84.  Congress thus allowed for something to be an "agency" under § 552(f)(1) but *not* an "agency" under § 551(1) or § 701(b)(1).  In other words, because of the 1974 amendment, all APA agencies are FOIA agencies, but not vice-versa.

The Commission is precisely this sort of FOIA-only agency.  The Court's previous opinion got us halfway to this conclusion, since it held that the Commission is an "agency" under § 552(f)(1).  Any impression conveyed that the Commission is also an "agency" under § 551(1) and § 701(b)(1) was *dicta*.

*Energy Research* was the template for the Court's opinion.  It held that the Defense Nuclear Facilities Safety Board was an "agency" under FOIA because the Board's organic statute called it an "establishment in the executive branch," one of the categories in § 552(f)(1).  *Id.* at 582–83.  And there was "nothing to indicate that Congress intended to excuse the Board from complying with FOIA."  *Id.* at 583.  That was the end of the matter.  For entities that fit into one of the § 552(f)(1) categories, *Soucie*'s functional test determines agency status only if the entity is in the White House.  *See id.* at 584 (citing *Crooker v. Office of the Pardon Attorney*, 614 F.2d 825, 828 (2d Cir. 1980)).  The Board was not in the White House, so the functional test was irrelevant to its status as an "agency" under § 552(f)(1).  *See id.* at 582–84.  Then in *dicta*, the court opined that the Board exercised "substantial independent authority" and thus was also a FOIA "agency" under *Soucie*'s functional test.  *Id.* at 584–85.

This Court's previous opinion followed *Energy Research*'s analytical steps.  As with the Board, Congress made the Commission an "establishment in the executive branch," one of the categories in § 552(f)(1).  *NSCAI*, 419 F. Supp. 3d at 86.  Also like the Board, nothing in the Commission's organic statute suggested that Congress intended to excuse it from FOIA.  Indeed,

the opposite was true, since the 2019 NDAA excused a different entity from FOIA but did exempt the Commission.  *Id.* at 86–87.  And *Soucie* did not apply because—again like the Board—the Commission is not in the White House.  *Id.* at 89.  "The text of § 552(f)(1)" was therefore "dispositive" of the Commission's status as a FOIA "agency."  *Id.*

Then, relying on the *dicta* from *Energy Research*, the Court suggested in passing that the Commission exercises "substantial independent authority" and thus could meet *Soucie*'s functional test, too.  *Id.* at 89–90.  Still, the Court made clear that this functional test was "not relevant."  *Id.* at 90.  So, just as in *Energy Research*, its application of the functional test was *dicta*.  And because this discussion relied on the *dicta* from *Energy Research*, this was *dicta* upon *dicta*.

 The Government is thus imprecise when it asserts as the "law of the case" that the Commission is an "agency."  Defs.' Mem. at 16 n.2.  This assertion—without reference to specific statutory provisions—is only half correct.  Under the law-of-the-case doctrine, "the *same* issue presented a second time in the *same* case should lead to the *same result*."  *LaShawn A. v. Berry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996).  *Dicta* is not part of the law of the case.  *Nat'l Souvenir Ctr., Inc. v. Historic Figures, Inc.*, 728 F.2d 503, 511 (D.C. Cir. 1984).

By these standards, the law of this case is that the Commission is an "agency" under § 552(f)(1), because that was the dispositive point in the Court's first opinion.  But any *dicta*— including that the Commission also met *Soucie*'s functional test—is not the law of this case.

Unlike last time, it is now necessary to decide whether the Commission is an "agency" under § 701(b)(1)—as noted, the Court's jurisdiction over EPIC's APA claims turns on this.  The Government implicitly concedes that the Commission is an agency under § 701(b)(1), since it mistakenly reads the Court's previous opinion as having held this.  *See* Defs.' Mem. at 14, 16

n.2.  But the Court cannot simply adopt this concession.  "[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived."  *United States v. Cotton*, 535 U.S. 625, 630 (2002).  The Court thus has "an independent obligation to determine whether subject-matter jurisdiction exists."  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

And upon closer examination, the Court finds that the Commission is not an agency under § 551(1) or § 701(b)(1).  The D.C. Circuit's cases highlight two factors that are central to whether an entity wields "substantial independent authority":  investigative power and authority to make final and binding decisions.

Consider first *Soucie*.  The Circuit held that the Office of Science and Technology ("OST") was an agency because, beyond advising the President, it had the "independent function of evaluating federal programs."  448 F.2d at 1075.  Critically, in carrying out this "independent function," the OST wielded "portions" of Congress's own "investigatory power."  *Id.* at 1075 & n.27.  In describing this power, the court cited *McGrain v. Daugherty*, 273 U.S. 135 (1927), which upheld the Senate's authority to compel testimony.  *Id.* at 180.

The next decision introduced another factor:  whether an entity has "formal decision-making power."  *Grumman Aircraft Eng'g Corp. v. Reneg. Bd.*, 482 F.2d 710, 715 (D.C. Cir. 1973), *rev'd on other grounds*, 421 U.S. 168 (1975).  In holding that "Regional Boards" were "agencies" under § 551(1), the court emphasized that "in many cases" they were "empowered to make final decisions not even reviewable by the [Renegotiation] Board."  *Id.* at 714–15.

This "authority in law to make decisions" was the "important consideration" when the court held that "initial review groups" ("IRGs") were *not* "agencies" under § 551(1).  *Wash. Research Project, Inc. v. Dep't of Health, Educ. & Welfare*, 504 F.2d 238, 246, 248 (D.C. Cir. 1974).  The National Institute of Mental Health ("NIMH") used IRGs to review grant

applications, but the authority to make "final and binding" decisions rested with the NIMH, not

the IRGs.  *Id.* at 248 & n.15.  It did not matter that the NIMH "may be greatly influenced" by an

IRG's "expert view."  *Id.* at 248.  Given the functions that IRGs were "empowered by law to

perform," they did not wield "substantial independent authority."  *Id.* at 247–48.

Two months after *Washington Research Project*, Congress enacted the 1974 amendment

that expanded FOIA's definition of "agency."  *See* Pub. L. No. 93-502, § 3 (codified at 5 U.S.C.

§ 552(f)(1)).  The expanded definition encompasses entities in "the Executive Office of the

President."  *Id.*  But a conference report suggests that FOIA applies to these entities only if they

wield "substantial independent authority" under *Soucie.  See NSCAI*, 419 F. Supp. 3d at 88

(citing H.R. Conf. Rep. No. 93-1380, at 15 (1974)).  This conference report has spawned a series

of cases analyzing whether units in the White House exercise "substantial independent

authority."[4]  These cases echo the importance of decision-making authority.  *See, e.g.*, *Rushforth*

*v. Council of Econ. Advisers*, 762 F.2d 1038, 1042–43 (D.C. Cir. 1985) (holding that the Council

on Economic Advisers, which has a duty "to appraise federal programs relative to a particular

statutory policy and make recommendations to the President in that regard" but has no authority

to "issue regulations for procedures based on the appraisals," is not an agency under *Soucie*'s

functional test).

To be sure, "much of the focus" in these White House cases "was on the *independence*

aspect" of "substantial independent authority."  *Dong v. Smithsonian Inst.*, 125 F.3d 877, 881

---

[4]  *See CREW v. Office of Admin.*, 566 F.3d 219, 220 (D.C. Cir. 2009); *Armstrong v. Exec. Office of the President*, 90 F.3d 553, 558 (D.C. Cir. 1996); *Sweetland v. Walters*, 60 F.3d 852, 854 (D.C. Cir. 1995); *Meyer v. Bush*, 981 F.2d 1288, 1297 (D.C. Cir. 1993); *Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038, 1043 (D.C. Cir. 1985); *Pac. Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259, 1263 (D.C. Cir. 1980); *Sierra Club v. Andrus*, 581 F.2d 895, 901–02 (D.C. Cir. 1978), *rev'd on other grounds*, 442 U.S. 347 (1979).

(D.C. Cir. 1997).  The goal was to identify the White House units closest to the President, for imposing FOIA on them would be "a potentially serious congressional intrusion into the conduct of the President's daily operations."  *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 226 (D.C. Cir. 2013); *see NSCAI*, 419 F. Supp. 3d at 90.

But of course, many entities *not* in the White House are independent of the President, so for them, the "authority" prong is the sticking point.  *See Dong*, 125 F.3d at 881.  On this, *Dong* is particularly instructive.  Statutory delegation of "authority" is key.  *See id.* at 882.  And "the requisite type of authority" is the "final and binding" kind.  *Id.* at 881 (citing *Wash. Research Project*, 504 F.2d at 248 n.15).

More, the requirement of "substantial" authority suggests that the entity should be at the "center of gravity in the exercise of administrative power."  *Id.* at 882 (quoting *Lombardo v. Handler*, 397 F. Supp. 792, 796 (D.D.C. 1975), *aff'd*, 546 F.2d 1043 (D.C. Cir. 1976)).  On this basis, the National Academy of Sciences was not an agency "despite the fact that it possessed the apparent authority . . . to veto the Environmental Protection Agency's suspension of auto emission standards."  *Id.* (citing *Lombardo*, 397 F. Supp. at 794).

Applying these principles, *Dong* held that the Smithsonian is not an "agency" under § 551(1) because it "does not make binding rules of general application or determine rights and duties through adjudication" and "issues no orders and performs no regulatory functions."  *Id.*

So too here.  The Commission's statutory duties are to carry out a review and to report to the President and Congress on its findings and recommendations.  Pub. L. No. 115-232, § 1051(b)–(c).  Congress thus did not give the Commission the sort of "final and binding" decision-making authority that the case law contemplates.  *See Dong*, 125 F.3d at 881; *Wash.*

*Research Project*, 504 F.2d at 248 & n.15.  Much less did Congress place the Commission at the "center of gravity in the exercise of administrative power."  *Dong*, 125 F.3d at 882.

To be sure, the Commission's "review" entails a degree of "investigation."  It has received "more than 100 briefings" from agencies and Members of Congress, covering topics like "the status of the U.S. government's artificial intelligence strategies."  Compl. ¶¶ 38, 46, 64, 68, 70.  But there is no suggestion—either in the statute or in the record—that the Commission has any subpoena or contempt authority, the sort of powers incident to Congress's "broad power of inquiry."  *Soucie*, 448 F.2d at 1075 & n.27; *see McGrain*, 273 U.S. at 168–69, 180.

Given these considerations, the Commission does not exercise "substantial independent authority."  *Accord Flaherty v. Ross*, 373 F. Supp. 3d 97, 106–10 (D.D.C. 2019).[5]  The upshot is that the Commission is an "agency" under § 552(f)(1) but *not* an "agency" under § 551(1) or § 701(b)(1), exactly the sort of entity Congress intended to capture when it expanded FOIA's definition of "agency" in 1974.  *See Energy Research*, 917 F.2d at 583 ("Through [the] words ["establishment in the executive branch"], Congress sought to encompass entities that might have eluded the APA's definition in § 551(1)[.]").  But because the Commission is not an "agency" under § 701(b)(1), the Court must dismiss EPIC's APA claims (Counts II, III, and V) for lack of jurisdiction.  *See Trudeau*, 456 F.3d at 187 & n.13.

---

[5] *Dicta* in *Energy Research* supports this conclusion.  Congress authorized the Nuclear Safety Board to "conduct hearings," "compel testimony," and "require the production of documents." 917 F.2d at 582.  It thus "ha[d] at its disposal the full panoply of investigative powers commonly held by other agencies of government."  *Id.* at 584.  The Board also had "the additional authority to impose reporting requirements on the Secretary of Energy."  *Id.* at 585.  The Commission has no analogous powers.

**B.**

That leaves Counts I and IV; EPIC labels both as "Violation of the FACA."  Compl. at

28, 31.  EPIC "does not assert that it has a cause of action under" FACA.  Pl.'s Mem. at 30 n.2;

*see, e.g.*, *EPIC v. Drone Advisory Comm.*, 369 F. Supp. 3d 27, 36–38 (D.D.C. 2019) (concluding

that FACA does not confer a private right of action).  Instead, it seeks mandamus relief based on

alleged violations of FACA.  *See* Compl. ¶¶ 115, 118, 136, 139; Pl.'s Mem. at 28–30, 30 n.2.

Even though sovereign immunity bars EPIC's claims under the APA, this immunity does

not bar mandamus relief.  *See Swan v. Clinton*, 100 F.3d 973, 981 & n.4 (D.C. Cir. 1996).  The

mandamus statute provides that "district courts shall have original jurisdiction of any action in

the nature of mandamus to compel an officer or employee of the United States or any agency

thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.  It is settled that "[i]f a

plaintiff seeks a writ of mandamus to force a public official to perform a duty imposed upon him

in his official capacity . . . no separate waiver of sovereign immunity is needed."  *Wash. Legal

Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897, 901 (D.C. Cir. 1996).[6]

Whether this immunity exception applies "depends upon whether the Government has a

duty" to comply with the "open meetings" and "public records" requirements in FACA.  *Id.*; *see*

Compl. ¶¶ 115, 136 (citing 5 U.S.C. app. 2 § 10(a)(1)–(2), (b)).  So "the question of jurisdiction"

under the mandamus statute "merges with the question on the merits."  *Wash. Legal Found.*, 89

F.3d at 902.  And the merits question here is whether the Commission is an "advisory

committee" under 5 U.S.C. app. 2 § 3(2), because if it is, then it must comply with FACA's

requirements.  *See* 5 U.S.C. app. 2 §§ 4(a), 10.  To this question the Court now turns.

---

[6]  The Defendants listed for Counts I and IV are the Commission and two officials—Eric
Schmidt, its Chairman, and Ylli Bajraktari, its Executive Director.  Compl. at 28, 31.

Congress enacted FACA in 1972 to provide a framework for the many boards, councils, and commissions that advise the Executive Branch. *See Pub. Citizen v. DOJ*, 491 U.S. 440, 445–46 (1989). It found that these bodies are "a useful and beneficial means of furnishing expert advice, ideas, and diverse opinions to the Federal Government." 5 U.S.C. app. 2 § 2(a). And it saw a need to keep the public "informed" about their "activities." *Id.* § 2(b)(5).

To that end, FACA calls for open meetings. A committee's meetings "shall be open to the public." *Id.* § 10(a)(1). "[T]imely notice" of these meetings "shall be published in the Federal Register." *Id.* § 10(a)(2). This transparency extends to records, too. "Subject to [5 U.S.C. § 552 (FOIA)]," all documents "which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying . . . until the advisory committee ceases to exist." *Id.* § 10(b). Unlike FOIA, this provision looks forward. It requires committees to take affirmative steps to make their records are public, even absent a request.

FACA's definition of "advisory committee" has four parts. *First*, it includes "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof." *Id.* § 3(2). *Second*, it must be "established by statute or reorganization plan," "established or utilized by the President," or "established or utilized by one or more agencies." *Id. Third*, it must be "established" or "utilized" "in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government." *Id. Fourth*, the definition *excludes* "any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government." *Id.* The Court agrees with EPIC that the Commission meets this definition.

Start with the text of the 2019 NDAA, the Commission's organic statute. Congress established a "Commission." Pub. L. No. 115-232, § 1051(a)(1). Its mandate is to "consider the

15

methods and means necessary to advance the development of artificial intelligence . . . to comprehensively address the national security and defense needs of the United States." *Id.* § 1051(b)(1).  And it must report "to the President and Congress" its "findings" and "recommendations . . . for action by the executive branch and Congress related to artificial intelligence." *Id.* § 1051(c); *see also* 2020 NDAA, Pub. L. No. 116-92, § 1735(c).

These words fit the definition of "advisory committee" like a glove.  From a purely commonsense standpoint, is the National Security Commission on Artificial Intelligence an "advisory" commission?  Of course it is.  Congress created a "commission."  5 U.S.C. app. 2 § 3(2).  It is "established by statute" and "utilized by the President." *Id.*  And since it provides "findings" and "recommendations" to the President, it is "established" and "utilized" "in the interest of obtaining advice or recommendations for the President." *Id.*

More, Congress noticeably declined to exempt the Commission from FACA, even though it carved out FACA exemptions elsewhere in the same law.  The 2019 NDAA creates the Cyberspace Solarium Commission but declares that "[t]he provisions of the Federal Advisory Committee Act . . . shall not apply to the activities of [this] Commission."  Pub. L. No. 115-232, § 1652(m)(1).  The law also states that "[s]ubsections (a)(1), (a)(3), and (b) of section 10 and sections 11, 13, and 14 of the Federal Advisory Committee Act . . . shall not apply" to a body called "the Emerging Technology and Research Advisory Committee." *Id.* § 1758(f)(5).

The Court likewise found the lack of an exemption significant in concluding that the Commission is subject to FOIA. *See NSCAI*, 419 F. Supp. 3d at 86–87.  The 2019 NDAA excuses the Cyberspace Solarium Commission from FOIA, *see* Pub. L. No. 115-232, § 1652(m)(2), but does not excuse the AI Commission from FOIA.  So too for FACA.

The Government protests that "no canon of statutory construction provides that the Court should assign weight to [the] absence" of an "explicit exemption." Defs.' Reply at 17, ECF No. 33. But here, that is wrong, since Congress elsewhere carved out exemptions. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (cleaned up).

The Government also points to one example—from a different law—in which Congress made clear that FACA applies. Defs.' Reply at 17–18; *see* Pandemic and All-Hazards Preparedness and Advancing Innovation Act of 2019 ("Pandemic Act"), Pub. L. No. 116-22, § 505(d), 133 Stat. 905, 952 ("The Federal Advisory Committee Act . . . shall apply to the activities and duties of the [Presidential Advisory Council on Combating Antibiotic-Resistant Bacteria]."). Based on this example, the Government contends that "it is at least as telling that Congress also did not explicitly make the Commission an advisory committee." Defs.' Reply at 17. Not quite. Congress formed the Commission using language that tracks FACA's definition of "advisory committee." That was enough to "make" the Commission an advisory committee.

It is a fair point that Congress did not declare in so many words that "FACA shall apply" to the Commission. But a weak one. The one example the Government cites was in the Pandemic Act, not the 2019 NDAA. The 2019 NDAA itself contains no examples of Congress saying that "FACA shall apply." It contains only examples of Congress saying that "FACA shall not apply." Yet the NDAA does not use this language for the Commission. This reinforces the conclusion that Congress made the Commission an "advisory committee." *See Russello*, 464 U.S. at 22–23.

EPIC also points out that Congress passed on a second chance to exempt the Commission from FACA.  Pl.'s Mem. at 19–20.  The 2020 NDAA extended the life of the Commission and gave it some new reporting deadlines, but it said nothing about FACA.  *See* Pub. L. No. 116-92, § 1735.  And once again, Congress exempted a *different* entity from FACA in the same law.  *See id.* § 6433(a) ("The Federal Advisory Committee Act . . . shall not apply to the [advisory board for the National Reconnaissance Office].").

The Government responds that "there was no need to include a FACA exemption" in the 2020 NDAA because (1) Congress passed it *after* this Court ruled that the Commission is an "agency"; (2) Congress is presumed to know extant law; and (3) extant law holds that an "agency" cannot also be an "advisory committee."  Defs.' Reply at 18.  But even assuming Congress would note an interim ruling by a district court in ongoing litigation, this third premise is wrong—under extant law, at least some agencies can be advisory committees, and the Commission is case in point.  *See infra* Section III.B.1.

In short, the language that Congress used to create the Commission matches FACA's definition of "advisory committee."  And Congress twice declined to excuse the Commission from FACA, even though both laws carved out FACA exemptions for other entities.  The Court thus concludes that the Commission is an "advisory committee" subject to FACA.

The Government resists this conclusion on two overarching grounds.

**1.**

Its primary contention is that the Commission, as an "agency," cannot also be an "advisory committee."  Defs.' Mem. at 8.  This argument fails because the Government's authorities do not support the categorical principle that *all* agencies cannot be advisory committees.  At most they suggest that a § 551(1) agency cannot be an advisory committee.

That is significant, because the Commission is an "agency" under § 552(f)(1) but not an "agency" under § 551(1).  *See supra* Section III.A.  The Government cites no case holding that *this* sort of agency cannot be an advisory committee.  To the contrary, Congress has devised a statutory scheme that allows § 552(f)(1) agencies like the Commission to be advisory committees subject to FACA.

The Government's notion of a categorical principle stems mainly from a series of decisions in this District.  Defs.' Mem. at 14; Defs.' Reply at 9 n.2.  The first was *Gates v. Schlesinger*, 366 F. Supp. 797 (D.D.C. 1973), which stated that "an advisory committee is not an 'agency.'"  *Id.* at 799.

*Gates*'s first rationale for this conclusion was that FACA "utilizes the definition of agency contained in . . . 5 U.S.C. § 551(1)" and "contains a separate and distinct definition of an 'advisory committee.'"  *Id.* at 798–99.  It is true that FACA defines "advisory committee" in § 3(2) and separately defines "agency" in § 3(3).  5 U.S.C. app. 2 § 3(2), (3).  But nothing in section 3 excludes the possibility that an "advisory committee" can fit within the definition of "agency" and vice-versa.  And certainly, agencies are commonly "established by statute," "utilized by the President," or even "utilized" by *other* agencies "in the interest of obtaining advice or recommendations."  *Id.* § 3(2) (definition of "advisory committee").

Indeed, many statutes list separate definitions that are not necessarily mutually exclusive.  Pl.'s Reply at 11, ECF No. 35.  Take 5 U.S.C. § 552a, which defines "individual" as "a citizen of the United States" and separately defines "Federal personnel" as "officers and employees of the Government."  5 U.S.C. § 552a(a)(2), (a)(13).  A "citizen of the United States" and "officers and employees of the Government" are of course not mutually exclusive concepts, even though they appear in separate definitions.  Likewise here.

19

In any event, *Gates* is distinguishable because it says nothing about entities—like the Commission—that are agencies under § 552(f)(1) but *not* § 551(1).  And it could not have. *Gates* was decided in 1973, *before* Congress added § 552(f)(1) in 1974.  FACA defines "agency" to have "the same meaning as in section 551(1) of title 5."  5 U.S.C. app. 2 § 3(3).  And FACA does not mention § 552(f)(1).  So even if *Gates* is right that FACA's definitions of "advisory committee" and "agency" are mutually exclusive, this just means an "agency" under § 551(1) cannot be an advisory committee.  Nothing in FACA or *Gates* prevents a § 552(f)(1) agency from also being an advisory committee.

This point—that the Commission is an "agency" under § 552(f)(1) but not § 551(1)—is key for another reason.  Under *Soucie*, the touchstone of agency status under § 551(1) is "substantial independent authority."  *Gates*, *Washington Research Project*, and the DOJ's Office of Legal Counsel ("OLC") suggest that entities wielding "substantial independent authority" cannot be "advisory" committees.  But even if true, this point is irrelevant here, since the Commission does not wield "substantial independent authority."  *See supra* Section III.A.

Specifically, *Gates* cites *Soucie*'s holding that § 551(1) "confers agency status on any administrative unit with substantial independent authority."  366 F. Supp. at 799.  The committee in *Gates* was "advisory only" and "possesse[d] no 'substantial independent authority.'"  *Id.*  This reasoning suggests that the concept of "advisory" in FACA and the concept of "substantial independent authority" in § 551(1) are mutually exclusive.

The D.C. Circuit echoed this suggestion when, applying *Soucie*'s "substantial independent authority" test, it opined that "IRGs are advisory committees . . . and are not agencies [under § 551(1)]."  *Wash. Research Project*, 504 F.2d at 246–47.  This decision, like

*Gates*, came before Congress enacted § 552(f)(1), so it could not have been drawing any conclusions about entities that are agencies under § 552(f)(1) but not § 551(1).[7]

To be sure, the OLC has opined that entities wielding substantial independent authority— *i.e.*, § 551(1) agencies—cannot be advisory committees. "FACA," in its view, "is predicated on the assumption . . . that advisory committees give advice and recommendations, whereas agencies are operating arms of government characterized by 'substantial independent authority in the exercise of specific functions.'" *Disclosure of Advisory Comm. Deliberative Materials*, 12 Op. O.L.C. 73, 81 (1988). This "statutory distinction," it concludes, signifies that "advisory committees are not agencies." *Id.*

It is not entirely clear that "advisory" and "substantial independent authority" are mutually exclusive concepts. But the Court need not resolve this, because the Commission does not wield "substantial independent authority" and is not an agency under § 551(1). *See supra* Section III.A. The exclusive focus on § 551(1) in *Gates*, *Washington Research Project*, and the OLC opinion does not speak to whether an entity like the Commission—an "agency" only under § 552(f)(1)—can be an advisory committee.

After *Gates*, the next decision to conclude that "an advisory committee cannot have a 'double identity' as an agency" was *Wolfe v. Weinberger*, 403 F. Supp. 238, 242 (D.D.C. 1975).

---

[7] Though *Washington Research Project* noted that "IRGs are advisory committees," 504 F.2d at 246, it also stated that "[w]hether the IRG is subject to the disclosure requirements of [FACA] is not a question before this court," *id.* at 249 n.15. So it is not even clear that the court was distinguishing § 551(1) agencies from FACA advisory committees. *See id.* at 248 & n.15.

The Government also cites *Forsham v. Califano*, 587 F.2d 1128 (D.C. Cir. 1978), for the proposition that agencies cannot be advisory committees. Defs.' Mem. at 21, 23; Defs.' Reply at 12. But *Forsham* merely quoted the language from *Washington Research Project* that "the IRGs are advisory committees . . . and are not agencies," 587 F.2d at 1135, and it nowhere mentions § 552(f)(1). So it provides no more support for the Government's position than *Washington Research Project* itself.

It gave another rationale:  "the definition of 'advisory committee' in [FACA] specifically excludes 'any committee which is composed wholly of fulltime officers or employees of the Federal Government,' thus providing further evidence that 'agency' and 'advisory committee' were not meant by Congress to be congruent concepts."  *Id.* (quoting 5 U.S.C. app. 2 § 3(2) (1972)).  The implicit assumption in this rationale is that all agencies are "composed wholly of fulltime officers or employees of the Federal Government."  But *Wolfe* gave no basis for that assumption, nor does the Government provide any.  *See* Defs.' Reply at 12–13.  The better approach is simply to ask if an entity consists wholly of full-time federal employees.  If so, it is not an advisory committee, no matter if it is an agency.

More, *Wolfe* is also outdated.  At the time, the exclusion in § 3(2) was only for groups "composed wholly of full-time officers or employees."  Federal Advisory Committee Act, Pub. L. No. 92-463, § 3(2), 86 Stat. 770, 770 (1972).  But now, the exclusion is for groups "composed wholly of full-time, *or permanent part-time*, officers or employees of the Federal Government." 5 U.S.C. app. 2 § 3(2) (2018) (emphasis added); *see* Federal Advisory Committee Act Amendments of 1997, Pub. L. 105-153, § 2(a), 111 Stat. 2689, 2689.  The Government here argues that the Commission—an agency—has only "permanent part-time" employees.  Defs.' Mem. at 20.  So, by the Government's own logic, *Wolfe*'s assumption no longer holds—at least some agencies do not consist of full-time employees.  And the Government does not try to defend a modern version of *Wolfe*'s assumption:  that all agencies consist wholly of full-time or permanent part-time employees.  *See id.* at 21–22; Defs.' Reply at 9, 12–13.  So there is no basis to conclude that Congress obliquely barred dual status through FACA's employee-based exclusion.

And in any event, Congress made the Commission's employees "temporary," not "permanent," *see infra* Section III.B.2, which shows that FACA's employee-based exclusion does not encompass all agencies. In sum, *Wolfe* does not foreclose the possibility that something can—all at once—be an "agency" solely under § 552(f)(1), consist of "temporary" federal employees, and be an "advisory committee."

Three more recent cases likewise conclude that an advisory committee cannot have a "double identity" as an agency, but they do not expand on the reasoning from *Gates* or *Wolfe*. *See Drone Advisory Comm.*, 369 F. Supp. 3d at 41; *Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 33 (D.D.C. 2011); *Heartwood, Inc. v. U.S. Forest Serv.*, 431 F. Supp. 2d 28, 36 (D.D.C. 2006). None of these decisions mentions § 552(f)(1) much less considers whether something that is an "agency" under § 552(f)(1) but not § 551(1) can be an "advisory committee." So they support the Government's position no more than *Gates* or *Wolfe*.

The Government next highlights complications that could arise if FOIA and FACA apply to the same entity. Defs.' Mem. at 14–16. It asserts that FOIA and FACA impose "independent, mutually exclusive [disclosure] obligations." *Id.* at 14. The Government invites the Court to accept this premise and work backward from there to conclude that Congress could not have meant what it said in the 2019 NDAA when it made the Commission subject to both statutes.

The Court declines this invitation. Even though FOIA and FACA have different disclosure requirements, the Court sees no conflict between those requirements as the Government has framed them. And even if there were a conflict, that would not be a license to ignore what Congress said. Because Congress, through the 2019 NDAA, made the Commission

subject to both FOIA and FACA, it will be incumbent on the parties and the Court to resolve any difficulties in the application of these statutes if that time comes.[8]

The Government claims it is a problem that FOIA and FACA "apply to different documents." Defs.' Mem. at 15. There are two arguments baked in here. First, the Government suggests that records of advisory committees cannot, by definition, be records of agencies. *Id.*; Defs.' Reply at 7–8, 8 n.1. It cites *Judicial Watch, Inc. v. Department of Energy*, 412 F.3d 125 (D.C. Cir. 2005), which dealt with the records of employees that the Department of Energy ("DOE") had detailed to the National Energy Policy Development Group ("NEPDG"). *Id.* at 132. The Government quotes the court's statement that "the records those employees created or obtained while on detail were those of the NEPDG, not those of the DOE, and hence not 'agency records' within the meaning of FOIA." *Id.* It takes this to mean that the NEPDG's records were not agency records *because* the NEPDG was an advisory committee. *See* Defs.' Reply at 8 n.1.

The court could not have meant this, though, because it had concluded a month earlier that "the NEPDG was not a FACA advisory committee." *In re Cheney*, 406 F.3d 723, 730 (D.C. Cir. 2005). The holding of *Judicial Watch* was instead much more straightforward: the NEPDG's records were not agency records because the NEPDG was not an "agency." 412 F.3d at 129, 132. It did not come close to holding that advisory committee records cannot, by definition, be agency records. *Judicial Watch* thus does not bear the weight that the Government assigns to it. *See* Defs.' Reply at 7–8.

---

[8] Indeed, EPIC has potentially smoothed the road already. Its FOIA request sought "[a]ll records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda[s], or other documents which were made available to or prepared for or by" the Commission, a direct quotation from section 10(b) of FACA. Pl.'s Mot. Exs. at 21. EPIC agrees that its FOIA request "exactly track[s] the language of FACA § 10(b)"—*i.e.*, that its FOIA request is meant to be coterminous with FACA's parameters. Pl.'s Mem. at 24; Pl.'s Reply at 9.

Second, on this subject of records, the Government invokes the so-called "staff work" exception to FACA.  Defs.' Mem. at 15.  Under this exception, the Government says, "'staff work' or other documents not directly considered by the committee members are not subject to FACA's open records requirement." *Id.*  FOIA, by contrast, "contains no equivalent exception." *Id.*  Assuming without deciding that this "staff work" exception exists,[9] the Court sees no conflict.  Under the Government's framing of the exception, if FACA and FOIA apply to the same entity, FACA requires it to disclose certain records, and FOIA requires it to disclose certain *additional* records.  But this would just mean an entity that is both an advisory committee and an agency has greater transparency obligations—for "staff work"—than an entity that is only an advisory committee.  There is nothing problematic about this.  *See* Pl.'s Mem. at 25 ("Congress may add to the transparency requirements of a federal entity as it desires; there is no provision or rule that limits disclosure obligations to *just* the FOIA or *just* the FACA for a particular entity.").

The Government's next argument revolves around FOIA's Exemption 5, which exempts from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5); *see* Defs.' Mem. at 15–16.  It posits that Exemption 5 reveals the "clearest inconsistency in deeming the same entity an advisory committee and an agency."  Defs.' Reply at 8.  The problem, according to the Government, is that FACA generally requires disclosure of records, yet Exemption 5 would shield a portion of these records from public view, which would undermine FACA's "purpose."  *Id.* at 8–9.  *Gates*, *Wolfe*, and the 1988 OLC opinion echo this concern.  *See Gates*, 366 F. Supp. at 799–800; *Wolfe*, 403 F. Supp. at 242–43; *Disclosure of*

---

[9]  EPIC suggests that it does not.  *See* Pl.'s Mem. at 24 & n.1.

*Advisory Committee Deliberative Materials*, 12 Op. O.L.C. at 77.  The Court is unconvinced that a single FOIA exemption prevents Congress from imposing FOIA and FACA on the same body.

To begin with, even accepting that FACA's "purpose" is relevant, *Gates* and *Wolfe* are once again distinguishable.  Those cases dealt with advisory committees already subject to FACA, and the question was whether they were also agencies.  If the answer were yes, both decisions reasoned, that would allow the advisory committee to exploit Exemption 5, which would undermine FACA's purpose.  *See Gates*, 366 F. Supp. at 799–800; *Wolfe*, 403 F. Supp. at 242–43.  Here, we have the reverse situation.  The starting point is that the Commission is an agency subject to FOIA, *see NSCAI*, 419 F. Supp. 3d at 86, so on the Government's view, Exemption 5 is already in play, *see* Defs.' Reply at 8.  The Government now tries to argue that because Exemption 5 may shield some records that FACA would otherwise bring to the light of day—which would work to the Government's advantage—the Court should excuse the Commission from FACA *entirely*.  But permitting the Government this *double* advantage would hardly serve FACA's goal of transparency.

More, Exemption 5 fails to present a conflict.  Under the Government's framing, Exemption 5 would permit the Commission to withhold certain records that are otherwise subject to disclosure under FACA.  *Id.*  Assuming for sake of argument that this framing is correct, it represents a way to *reconcile* FOIA and FACA:  working together, they favor withholding certain documents.  *Cf.* Pl.'s Reply at 8 ("The fact that the FOIA and the FACA generally treat deliberative records differently does not make the statutes irreconcilable; it simply means that a court must reconcile [their] disclosure provisions if and when that court confronts an assertion of Exemption 5 by a dual FOIA-FACA entity." (citation omitted)).

The lack of a conflict is particularly apparent here because FACA's disclosure provision *incorporates* FOIA's exemptions. *See* 5 U.S.C. app. 2 § 10(b) ("*Subject to* [5 U.S.C. § 552], the . . . documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying[.]" (emphasis added)); *NRDC v. Johnson*, 488 F.3d 1002, 1003 (D.C. Cir. 2007) ("FACA incorporates the FOIA exemptions."). So, as EPIC puts it, "Congress has already done much of the work to reconcile FACA § 10(b) and the FOIA exemptions." Pl.'s Reply at 7.

Finally, the Government's arguments about Exemption 5 reduce to arguments about purpose, *see* Defs.' Reply at 8–9, but that is the wrong way to go about statutory interpretation. Gone are the days when arguments about a statute's purposes trump clear statutory text. *See, e.g.*, *Kloeckner v. Solis*, 568 U.S. 41, 55 n.4 (2012) ("[E]ven the most formidable argument concerning the statute's purposes could not overcome the clarity we find in the statute's text."). Here, the "clarity" in the text is that the 2019 NDAA made the Commission both an agency subject to FOIA, *see NSCAI*, 419 F. Supp. 3d at 86, and an advisory committee subject to FACA, *see supra* Section III.B. The Court declines to work backward from an argument about FACA's purpose to conclude that Congress could not have meant what it said in the 2019 NDAA.

The Government makes two final attempts to show a conflict between FOIA and FACA, but they are unavailing. It asserts that FOIA's disclosure obligations—unlike FACA's disclosure obligations—are "limited in time." Defs.' Mem. at 16. FOIA requires an agency to produce only records the agency controls at the time of the request, while FACA lacks this limitation. *Id.* The Government next states that FOIA and FACA "create different obligations with regard to the creation of documents." *Id.* FOIA does not require agencies to chronicle its activities, while FACA does. *Id.*

These different obligations are complementary, not conflicting.  If the Government is correct, an entity subject to FOIA and FACA would need to look backward, producing records in response to requests, and forward, chronicling its activities and continually supplementing its records.  This Janus-like status may be unusual, but it is not impossible.

 And even if there is some tension or conflict between FOIA and FACA, the Government has not offered a persuasive reason why that should matter.  It claims that complying with both "would impose greater burdens . . . than is contemplated by either statute alone [and would] wast[e] government resources on complying with redundant requirements."  Defs.' Reply at 13.  This, the Government stresses, "would produce an absurd and unjust result which Congress could not have intended."  *Id.* (quoting *Clinton v. City of New York*, 524 U.S. 417, 429 (1998)).

An appeal to absurdity faces "a high bar," and the Government has not come close to clearing it here.  *Stovic v. R.R. Ret. Bd.*, 826 F.3d 500, 505 (D.C. Cir. 2016).  The Government must deal with burdensome—and indeed conflicting—requirements in other areas of law, perhaps most notably in the context of criminal pretrial disclosures.  There, the Government faces at least three different and divergent discovery schemes.  *See, e.g.*, Cara Spencer, *Prosecutorial Disclosure Timing:  Does* Brady *Trump the Jencks Act?*, 26 Geo. J. Legal Ethics 997, 997 (2013).  Yet the Government has proven up to the task.[10]  The Court expects the same here.

For all these reasons, no rule prevented Congress from making the Commission what it is:  an "agency" under § 552(f)(1) but not § 551(1), and an "advisory committee" under FACA.

---

[10]  *See* U.S. Dep't of Justice, *9-5.000—Issues Related to Discovery Trials, and Other Proceedings*, https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings (last visited May 29, 2020) (clarifying how to navigate discovery).

**2.**

The Government's secondary argument is that the Commission falls within FACA's exclusion for "any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government." 5 U.S.C. app. 2 § 3(2).  It asserts that the Commission is "composed wholly of . . . permanent part-time . . . employees." Defs.' Mem. at 21–22.  EPIC responds that the Commission's members are neither "permanent" nor "part-time," but are "temporary" and "intermittent."  Pl.'s Mem. at 16–19.  The Court agrees with EPIC.

A straightforward reading of the 2019 NDAA reveals that the Commission's members are "temporary" federal employees.  The Commission "shall be considered . . . a temporary organization under [5 U.S.C. § 3161]."  Pub. L. No. 115-232, § 1051(a)(2).  The Commission's 15 members are "appointed for the life of the Commission" and are "Federal employees."  *Id.* § 1051(a)(4)(A), (6)–(7).

The natural reading of this language is that the Commission's members, as employees "appointed for the life" of a "temporary" federal organization, are "temporary" federal employees.  The Government has no direct response to this interpretation.  Instead, it states in conclusory fashion that the Commission's status as a temporary organization "does not prevent the commissioners from being permanent part-time employees."  Defs.' Mem. at 21.  It focuses on the word "permanent" and tries to explain why the Commission's members fit into that term even though they are employees of a temporary organization.  *Id.* at 21–22.  Its efforts are unavailing.

FACA does not define the term "permanent," so the Government urges the Court to interpret it "consistent with the relevant federal regulation[]."  Defs.' Reply at 15.  Already, there are problems.  For one, the immediate move to regulations is misplaced, because normally,

"[w]hen a term goes undefined in a statute, we give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). The Government offers an "ordinary understanding" of "permanent employee," but it is circular: "a person filling a permanent employment position." Defs.' Reply at 15. EPIC provides a more compelling ordinary meaning: "[w]ork that, under a contract, is to continue *indefinitely* until either party wishes to terminate it for some legitimate reason." Pl.'s Mem. at 17 (quoting *Employment*, Black's Law Dictionary (11th ed. 2009)). That does not describe the Commission's members, who are employed not indefinitely, but for the temporary "life of the Commission."

More, the case the Government cites for interpreting undefined terms "consistent with the relevant federal regulation[]" involved a far different situation from what we have here. *See FDIC v. Phila Gear Corp.*, 476 U.S. 426, 431–32 (1986). In that case, definitions in the regulations carried special weight because the FDIC had "developed and interpreted" them "for many years within the framework of the complex statutory scheme that [it] administers." *Id.* at 431.

Here, by contrast, the Government presents no reason why the provision it cites, 5 C.F.R. § 531.403, is even a "relevant federal regulation" for the term "permanent" in FACA. Defs.' Reply at 15. FACA charges the General Services Administration with issuing "administrative guidelines and management controls applicable to advisory committees," 5 U.S.C. app. 2 § 7(c), but it was a different agency—the Office of Personnel Management—that issued 5 C.F.R. § 531.403, *see* Pay Under the General Schedule, 46 Fed. Reg. 2317, 2320 (Jan. 9, 1981). More, the definitions in this regulation apply only "[i]n this subpart," *i.e.*, the subpart of the civil service regulations implementing a set of "pay-grade" statutes far afield of FACA. 5 C.F.R. § 531.403; *see id.* § 531.401.

In any event, the regulation's definition of "permanent" does not help the Government. The specific term that § 531.403 uses is not "permanent employee" but "permanent position." Its definition is "a position filled by an employee whose appointment is not designated as temporary by law and does not have a definite time limitation of one year or less." *Id.* § 531.403.  Under this definition, the Commission's members do not occupy "permanent positions" because their appointment *is* "designated as temporary by law" in the 2019 NDAA. Again, the Government offers no persuasive reason—or indeed, any reason at all—why employees of a "temporary" federal organization would be anything but "temporary" federal employees.  *See* Defs.' Reply at 15 n.5.

The Government also tries to rely on a "common law" meaning of "permanent employee," but this too fails.  It says that under the common law, "a permanent employee is one who is guaranteed a position with an employer so long as the employee's work is satisfactory and the employer continues to engage in work that requires the employee's job functions."  *Id.* at 16 (citing *Hodge v. Evans Fin. Corp.*, 707 F.2d 1566, 1568 (D.C. Cir. 1983)).  *Hodge* specifically contrasted this concept of "permanent employment" with employment "scheduled to terminate on a specific date."  *See* 707 F.2d at 1568.  The Commission is scheduled to terminate on a specific date, *see* 2020 NDAA, Pub. L. No. 116-92, § 1735(a), so its members do not meet the Government's "common law" definition of "permanent employee."

In sum, the Government offers no convincing reason to reject the natural reading of the 2019 NDAA—that the Commission's members, as employees of a "temporary" federal organization, are "temporary" federal employees.  So the Commission does not fall into FACA's exclusion for committees "composed wholly of . . . permanent part-time . . . employees."  5 U.S.C. app. 2 § 3(2).

A second, independent reason why the Commission does not fall within this exclusion is that its members are not "part-time" federal employees.  Instead, they are "intermittent" employees.  EPIC points to a regulation stating that "[a]n intermittent work schedule is appropriate only when the nature of the work is sporadic and unpredictable so that a tour of duty cannot be regularly scheduled in advance."  Pl.'s Mem. at 18 (quoting 5 C.F.R. § 340.403(a)).  This regulation explicitly distinguishes "intermittent" status from "part-time" status, as it says that "[w]hen an agency is able to schedule work in advance on a regular basis, it has an obligation to document the change in work schedule from intermittent to part-time or full-time to ensure proper service credit."  5 C.F.R. § 340.403(a).

The Court agrees with EPIC that "intermittent" accurately describes the employment status of the Commission's members.  All the members have day jobs, the Commission "meets in plenary every other month," and "each working group meets monthly."  *See* Compl. ¶¶ 44, 48 (cleaned up); Answer ¶¶ 44, 48, ECF No. 29.  For example, the Commission met on March 11, May 20, and July 11 of 2019.  *See* Compl. ¶¶ 63, 67, 69; Answer ¶¶ 63, 67, 69.  This limited and irregular work schedule fits the bill as "sporadic and unpredictable."  5 C.F.R. § 340.403(a).

The Government does not dispute that § 340.403 is relevant to the meaning of "part-time" versus "intermittent."  Indeed, it provides no affirmative argument for why the Commission's members are "part-time."  *See* Defs.' Mem. at 21–22; Defs.' Reply at 16–17.[11]

---

[11]  EPIC claims the Government's Answer conceded that "the members of the AI Commission are employed on an 'intermittent' basis."  Compl. ¶ 43 (quoting 5 C.F.R. § 340.403); *see* Pl.'s Mem. at 18.  The Government disagrees.  Defs.' Reply at 16–17.  The Court need not resolve this, as it does not rely on this aspect of EPIC's argument in concluding that the Commission's members are "intermittent" employees.  The Court also does not rely on EPIC's assertion—supported by a declaration attached to its reply brief—that the Commission's chief of staff stated that "the members of the Commission were employed in 'excepted service appointments on an intermittent basis.'"  Pl.'s Reply at 15; *see* Davisson Decl. ¶ 8, ECF No. 35-1.

One final point:  EPIC's position finds support in *Association of American Physicians & Surgeons, Inc. v. Clinton* ("*AAPS*"), 997 F.2d 898 (D.C. Cir. 1993).  *AAPS* considered the status the President's Task Force on National Health Care Reform and its working group.  *Id.* at 900.  The court remanded for further proceedings on the status of the working group.  *Id.*  It was composed in part of "40 'special government employees' hired by . . . agencies and the Executive Office of the President for a limited duration."  *Id.* at 901.

The court expressed skepticism that the working group—so composed—fell within FACA's exclusion.  "FACA would be rather easy to avoid if an agency could simply appoint 10 private citizens as special government employees for two days, and then have the committee receive the section 3(2) exemption as a body composed of full-time government employees."  *Id.* at 915.  Similar logic applies here.  FACA "would be rather easy to avoid" if the Government is right that private-citizen members of short-term advisory groups are always "permanent part-time" employees of the Federal Government.  Indeed, *AAPS* generalized that "a formal group of a limited number of private citizens who are brought together to give publicized advice as a group . . . would seem covered by [FACA]."  *Id.*  The Commission fits this model.

## C.

Because the Commission is an "advisory committee" that must comply with FACA's requirements, EPIC's entitlement to mandamus relief is straightforward.  The party seeking mandamus has the burden of showing "(1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists."  *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016).[12]

---

[12]  "Even when [these three] legal requirements for mandamus jurisdiction have been satisfied, however, a court may grant relief only when it finds compelling equitable grounds."  *Am. Hosp. Ass'n*, 812 F.3d at 189.  Given the Commission's clear duty to comply with FACA, the Court

EPIC has shown all three.  Since relief under the APA is unavailable, *see supra* Section III.A, "no adequate alternative remedy exists."  And the Government's sole argument for why EPIC has not established "a clear and indisputable right to relief" or "a clear duty to act" is that the Commission is not an "advisory committee" under FACA.  Defs.' Mem. at 20–24.[13]  This, of course, is the argument that the Court has rejected.  *See supra* Section III.B.

The Government's only remaining argument against mandamus is that EPIC did not "adequately plead[]" claims under the mandamus statute.  Defs.' Mem. at 18–19.  "[I]t is impossible to know," the Government complains, "what counts [EPIC] intended to pursue under" this statute "or the specific allegations that would support claims under [it]."  *Id.*  The Court disagrees.

EPIC styles its Complaint as one "for Injunctive, Mandamus, and Declaratory Relief."  Compl. at 1.  It cites the mandamus statute, 28 U.S.C. § 1361, in the Complaint's first paragraph and in its jurisdictional statement.  *Id.* ¶¶ 1, 7.  Then, in Count I, it claims that the Commission's "failure to timely notice and open [its] meetings violates 5 U.S.C. app. 2 §§ 10(a)(1) and (a)(2)

---

finds "compelling equitable grounds" for mandamus relief.  Indeed, the Government makes no argument for why, if the Commission is subject to FACA, there would not be "compelling equitable grounds" for relief.  Other than an argument that EPIC has an adequate alternative remedy in the APA and an argument that EPIC did not adequately plead mandamus claims, which the Court addresses *infra*, the Government's arguments against mandamus focus exclusively on its belief that the Commission is just not subject to FACA in the first place.  *See* Defs.' Mem. at 18–24; Defs.' Reply at 18–20, 18 n.6.

[13]  For the first element of mandamus, the Government invokes the doctrine of "judicial estoppel."  Defs.' Mem. at 22–24.  This doctrine "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000).  The Government contends that this doctrine bars mandamus relief because EPIC "prevailed on its earlier position that the Commission is an agency subject to FOIA" and "an entity cannot be both an agency and an advisory committee."  Defs.' Mem. at 23.  So the Government's invocation of "judicial estoppel" just boils down to its argument that the Commission is not an advisory committee.

and constitutes a failure to perform duties owed to EPIC within the meaning of 28 U.S.C. § 1361." *Id.* ¶ 115.  Count IV likewise asserts that the Commission's "failure to make [its] records available for inspection and copying is a violation of 5 U.S.C. app. 2 § 10(b) and constitutes a failure to perform a duty owed to EPIC within the meaning of 28 U.S.C. § 1361." *Id.* ¶ 136.  Both counts seek "a writ of mandamus" compelling the Commission and its officers to comply with FACA.  *Id.* ¶¶ 118, 139.  These counts make clear that EPIC seeks mandamus relief based on the Commission's refusal to comply with FACA.

And for the reasons explained, EPIC is correct that the Commission is subject to FACA. EPIC is thus entitled to writs of mandamus compelling the Commission and its officers to provide timely notice of its meetings, to open them to the public, and to make its records available for public inspection and copying.  *Id.* ¶¶ 115, 118, 136, 139; Compl. Requested Relief ¶¶ A, D; *see* 5 U.S.C. app. 2 § 10(a)(1)–(2), (b).

EPIC also seeks relief under the Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201. Compl. ¶ 1; Compl. Requested Relief ¶ H.  Under the DJA, the Court "may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a). This statute "is not an independent source of federal jurisdiction"; rather, "the availability of such relief presupposes the existence of a judicially remediable right."  *Schilling v. Rogers*, 363 U.S. 666, 677 (1960).  The Court independently has jurisdiction here under the mandamus statute, 28 U.S.C. § 1361, and EPIC has a judicially remediable right to have the Commission comply with its duties under FACA.  *See Wash. Legal Found.*, 89 F.3d at 901–02; *supra* Section III.B.  EPIC is thus entitled to a declaration that the Commission has a duty under FACA to provide timely notice of its meetings, to open them to the public, and to make its records

available for public inspection and copying.  *See* Compl. ¶¶ 115, 136; 5 U.S.C. app. 2

§ 10(a)(1)–(2), (b).[14]

## IV.

The mythology of Janus recognizes that backward- and forward-facing personae can

coexist.  Today, the Court holds that Congress can and did impose Janus-like transparency

obligations upon the AI Commission.  No rule of law forced Congress to choose just one.

The Court will dismiss Counts II, III, and V, and it will grant summary judgment for

EPIC on Counts I and IV.  A separate Order will issue.


Dated:  June 1, 2020                                            TREVOR N. McFADDEN, U.S.D.J.

---

[14]  The Government contends that EPIC did not adequately plead a claim under the DJA because
it never references this statute as an "independent cause[] of action."  Defs.' Mem. at 18–19.  But
the Government's own authorities show that EPIC was right not to plead it as an independent
cause of action.  *Id.* at 19.  It cites cases stating that the DJA does not itself provide "a cause of
action," *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011), and that "a count for declaratory
judgment . . . is more properly included in the prayer for relief," *Drone Advisory Comm.*, 369 F.
Supp. 3d at 38 (cleaned up).  So EPIC properly requested a declaration under 28 U.S.C. § 2201
in its request for relief.  *See* Compl. Requested Relief ¶ H.